**UNITED STATES of America**

**v.**

**Lloyd R. GROVER, Appellant.**

**No. 71-1355.**

United States Court of Appeals,
District of Columbia Circuit.

Argued April 21, 1972.

Decided Sept. 5, 1973.

**1040**

Devin John Doolan, Washington, D. C. (appointed by this Court), for appellant.

David G. Larimer, Asst. U. S. Atty., with whom Thomas A. Flannery, U. S. Atty. at the time the brief was filed, John A. Terry and John F. Evans, Asst. U.S. Attys., were on the brief, for appellee. Harold H. Titus, Jr., U. S. Atty., and James F. McMullin, Asst. U. S. Atty., also entered appearances for appellee.

Before BAZELON, Chief Judge, and LEVENTHAL and WILKEY, Circuit Judges.

PER CURIAM:

The appellant was convicted on both counts of an indictment charging second degree murder (D.C.Code § 22–2403) and carrying an unlicensed pistol (D.C. Code § 22–3204). Appellant challenges the judgment sentencing him to five to twenty years on the murder count, asserting it was error for the trial court. to deny defense counsel's request to amplify the instruction on self-defense.

Appellant has not challenged his conviction on the weapons charge, on which he was sentenced to a year's imprisonment.

### I. The Facts

Appellant concededly shot Jessie Toliver at about 6 p. m. on August 21, 1970. Appellant's contention requires that we begin the statement of facts in the light of appellant's testimony, with the crap game that began at approximately 4:20 p. m. at the home of appellant's mother. The game ended after about 15 minutes when appellant and Toliver engaged in a quarrel over appellant's consistent winning and over Toliver's "cussing" in front of the appellant's mother. When Toliver refused to stop, appellant punched him in the face, and bloodied him. Toliver gathered his belongings and left the house, saying to the appellant, "I'll be back."

Appellant testified that he took Toliver's parting remark as a threat to come back with a weapon, based upon his knowledge that Toliver had been involved in knife slashing incidents on prior occasions. Appellant decided to go home and arm himself lest Toliver return and, if appellant weren't there, "he'd take it out on my sister." Appellant went to his apartment and obtained a pistol and cartridges. As appellant walked back toward his mother's house, he encountered Toliver on R Street.[1] After a brief exchange of conversation, the appellant fired a shot at Toliver,

---

[1] There is a conflict in the testimony, not relevant to this appeal, whether Toliver crossed the street to intercept the appellant, or whether the appellant called him over.

wide of the mark. A second shot also missed its target. Appellant testified that, from the outset, he had backed away from Toliver—a total distance of some 35 feet—and that he pulled the revolver from his pocket only after Toliver continued advancing toward him in a menacing fashion, and suddenly pulled a hawk-billed knife from his belt and made a threatening gesture (indicated to the jury.) Appellant fired and missed, deceased kept advancing, and appellant, still backing up, shot four more times.

Appellant's testimony in support of his claim of self-defense diverged from the testimony of two police officers, who happened to be approaching the intersection of Third and R Streets in a patrol car, when they heard the initial shot. They looked down R Street and saw Toliver retreating from the appellant, who had the gun in his hand. During their observation, deceased was backing away the entire time, and made no threatening gestures. One of them overheard Toliver say to the appellant "You can't hit me, you're using blanks." Thereupon, the appellant fired three more shots, fatally wounding Toliver. The police officers promptly arrested the appellant and took him to police headquarters,

where a search of his person disclosed fourteen extra rounds of ammunition in the pocket of his walking shorts.

While appellants version differed from that of the police officers, the Government does not seem to dispute his testimony that deceased had a knife. Indeed, one of the policemen testified he saw what looked to be a knife in Toliver's right hand, held down at his side. And several defense witnesses stated they saw Toliver swing a knife at the appellant.[2]

## II. INSTRUCTIONS ON SELF-DEFENSE AND PROVOCATION

Appellant's principal contention is that a portion of the trial judge's instructions on provocation and self-defense were confusing when applied to the particular facts of this case and that the judge should have provided clarification. The judge instructed the jury:

> Generally, the defense of self-defense is not available to one who provokes the difficulty, and it is, therefore, important for you to determine who was the aggressor, the defendant or the decedent. Mere words without more are never considered provocation.[3]

2. Although no knife was found on or near Toliver's body, it was suggested that the knife may have been picked up by one of the many bystanders who gathered immediately after the shooting. The Government made no issue of this at trial and conceded throughout that Toliver had, in fact, been armed.

3. The full text of the instruction on self-defense was as follows:

Now, we have spoken here of justifiable and excusable homicide, and also included in that is self-defense. In this case it is the contention of the defendant that he was acting in self-defense at the time of this occurrence and I may say to you that if the defendant was acting in self-defense as I shall outline it to you, you should find that then he would not be guilty of either second degree murder of manslaughter.

On the other hand, if he was not acting in self-defense then he may be guilty of either or none, depending on what you find from the evidence.

Now, the contention that the defendant acted in self-defense makes it appropriate that I should instruct you on the law of self-defense. If the defendant did not provoke the assault and at the time of the occurrence had reasonable grounds to believe and in good faith believed that the complaining witness or the decedent was about to take his life or do him serious bodily injury, the defendant was not required to retreat nor to consider whether he could safely retreat but was entitled to stand his ground and meet force with force and meet any attack made upon him by the decedent in such manner and with such force as under the circumstances of the case, as you find it, he at the moment actually believed and had reasonable ground to believe was necessary to save his life or to protect himself from serious bodily injury.

The use of such force as at the time appears reasonably necessary is justified even though it may afterward turn out that the appearances were false and there

When counsel were asked whether there were any objections, appellant's trial counsel replied that he had no objection but he requested a clarification because of the ambiguity in the phrase "one who provokes the difficulty." He feared the jury might erroneously conclude that, because the appellant was the aggressor in the affray during the dice game—a fact not disputed by the defense—he was foreclosed from claiming self-defense as to the shooting, which occurred more than an hour later. Counsel urged the court to instruct the jury specifically that, in determining whether or not appellant was the aggressor, they must consider his conduct at the time of the shooting, not his actions during the earlier incident at his mother's house. This request was refused.

■ 1. We begin by noting that the rule that "generally the defense of self-defense is not available to one who provokes the difficulty," is subject to exceptions, and refinements, to explain the circumstances under which the rule should be applied. Thus, a man who is the instigator of an encounter that ultimately proves fatal may claim self-de-

fense if, prior to the fatal blow, he attempts in good faith to disengage himself from the altercation and communicates his desire to do so to his opponent.[4]

■ The trial judge omitted the "red book" suggested instruction that embodies this qualification.[5] However, there was no request for this instruction, and there was no testimony by defendant or anyone else to the effect that he had been the aggressor at the street scene and then retreated, nor was any such version a reconstruction of the incident that should naturally have suggested itself to the trial judge, in the absence of a suggested instruction.

2. Coming to the issue of need for clarification of the instruction as given, appellant is concerned that the jury may have thought the judge intended the jury to disallow a claim of self-defense solely because appellant had been the aggressor in the earlier incident at his mother's home.

■ Certainly, the jury could take account of appellant's prior aggressive behavior toward Toliver, and for example, could infer from the earlier assault that

---

was in fact neither design to do serious injury nor danger that it would be done or actual need to use so much force in self-defense.

Generally, the defense of self-defense is not available to one who provokes the difficulty, and it is, therefore, important for you to determine who was the aggressor, the defendant or the decedent. Mere words without more are never considered provocation.

4. Rowe v. United States, 164 U.S. 546, 17 S.Ct. 172, 41 L.Ed. 547 (1896) (per Harlan, J.). See Harris v. United States, 124 U.S. App.D.C. 308, 364 F.2d 701 (1966); Frady v. United States, 121 U.S.App.D.C. 78, 99, 348 F.2d 84, 105 (concurring opinion); cert. denied, 382 U.S. 909, 86 S.Ct. 247, 15 L.Ed.2d 160 (1965). Alternatively, the rule is sometimes stated thus: By reason of the initial aggression, the law imposes on the aggressor a duty to withdraw from the affray. But once having attempted to withdraw or retreat, the right to meet deadly force with deadly force is rekindled. See Perkins Criminal Law 1005 et seq. (1969).

5. See e. g., District of Columbia Bar Ass'n, Young Lawyer's Section, Criminal Jury Instructions for the District of Columbia, Instruction 5.17C, at 241 (2d ed., 1972):

If the defendant was the aggressor or if he provoked the assault upon himself, he cannot invoke the right of self-defense to justify his use of force. However, if one who provokes a conflict later withdraws from it in good faith, and communicates that withdrawal by words or actions, and he is thereafter pursued, he is justified in using deadly force to save himself from imminent danger of death or serious bodily harm.

Although the instruction's emphasis on "pursuit" by the victim, rather than retaliatory attack, renders this formulation less than perfect, it at least makes clear that the aggressor does not permanently forfeit his right of self-defense.

These instructions in red binders, are widely used by trial judges in the District of Columbia, but they are suggestions, derived from precedents, and are of course not binding.

appellant harbored malice toward Toliver, or that appellant was more likely to have been the aggressor in the street encounter.[6] They could consider this evidence in weighing appellant's testimony that Toliver instigated the fatal confrontation.[7]

■ But of course it would have been error to deny an otherwise established claim of self-defense solely because appellant had previously taken aggressive action toward Toliver. Unlike the circumstances present in Harris v. United States,[8] the incident at the dice game and the street confrontation were not merely stages in an essentially continuous chain of events. In the case at bar, the earlier episode was essentially a "one-punch fight." The effect of the disengagement of the parties and passage of an hour's time was to restore them to the *status quo ante*. Toliver's privilege of self-defense as to the earlier assault had dissipated, and any attack he might launch upon the appellant would constitute unlawful retaliation. Concomitantly, any disability on appellant because of his prior aggression was lifted, and he was able to defend himself against any subsequent attack. Rowe v. United States, *supra*. When both parties entered the street encounter there was a critical moment, and the jury had to determine which of the two men was the instigator at that time.

Standing alone, the concluding paragraph of the self-defense instructions might be open to the construction that appellant's aggressive behavior at the dice game precluded his later assertion of self-defense. When defense counsel focused on the issue, with a request that he said was not an "objection," the court said (Tr. 491):

> I think the whole thing is clear to the jury and when I start ad libbing and explaining instructions without the ability to really sit down and write them down, think them out, I end up likely in trouble where every word, every nuance means something. Now, I don't think there is any chance of this, so I shall not instruct them further in this.

This disposition is not without its weaknesses. It was made without even awaiting the Government's submission on the defense request. It is not clear why the judge should have concerned himself with being "in trouble" because he granted a clarification requested by defense counsel that had some possibility of merit. It should not have been decisive that defense counsel had nothing in writing to offer the court; this, after all, was not an instruction given at the request of the defense, and trial counsel had no prior knowledge of the specific phraseology the judge would use.[9]

6. In Harris v. United States, *supra*, we held that the Government was entitled to introduce evidence of a prior attack upon the deceased, which occurred some 50 minutes before the fatal stabbing, and that the jury might consider this evidence—and, indeed, "all the circumstances leading up to the fatal affray"—in determining whether or not to credit the accused's plea of self-defense. Our opinion in that case was addressed wholly to the question of admissibility; and, because there was clear proof that the accused, while armed with a knife, had initiated the fatal encounter by seeking out the deceased at his home, it was unnecessary for us to consider whether the earlier aggressive conduct would as a matter of law vitiate the subsequent claim of self-defense.

7. The prior assault of course constitutes uncharged misconduct. But the law is clear

that evidence of this sort is admissible for the limited purpose of showing intent, motive, and the like. Harris v. United States, *supra*; Burcham v. United States, 82 U.S. App.D.C. 283, 163 F.2d 761 (1947). *See* United States v. Marcey, 142 U.S.App.D.C. 253, 256, 440 F.2d 281, 284 (1971); Harper v. United States, 99 U.S.App.D.C. 324, 239 F.2d 945 (1957). Cf. Drew v. United States, 118 U.S.App.D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964).

8. See note 6, *supra*.

9. The instruction given was similar to one in the "red book" (*supra*, note 5), but defense counsel could not know what portions of these would be used, and as already noted one of them was not included (see point 1). Indeed, the instruction as given by the trial judge was not identical with the red book suggestion, which uses the phrase "provokes

 We would give serious consideration to reversal if we were of the view that there was a significant possibility of prejudice. But we think that possibility, in this case, is gossamer. As defense trial counsel put it in requesting clarification, the earlier incident was "a slight altercation with a punch." It did not loom large at trial. The essence of the dispute at the trial and in the summation of the counsel was the nature of the street confrontation. The witnesses were examined at length on such matters as whether or not appellant beckoned the deceased across the street; whether it was appellant or the deceased who was moving towards the other when the shooting occurred; whether deceased threatened appellant with the knife; why appellant had armed himself; what were their respective states of mind just before the shooting. Moreover, the possible ambiguity of this paragraph was offset by the context, for the rest of the self-defense instruction (supra, note 3) told the jury to focus on the situation "at the time of this occurrence" (twice), and to acquit if the defendant used such force "as under the circumstances of the case, as you find,

he at the moment actually believed" and reasonably believed was necessary to protect against serious bodily harm.

In essence, we conclude that the verdict reflects the jury's crediting the prosecution witnesses who testified that the fatal shot came when the appellant's gun was advancing and firing on the retreating knife of the deceased. It was on this point that the defense and prosecution witnesses were in conflict, and that the jury had to determine the fact. We could accept the contention of appellant counsel only if we constructed as a serious possibility that the jury supposed they were being told to convict even if they wholly believed defendant in his testimony.[10] And we simply do not take this as a serious possibility. We discern no prejudicial error.[11]

Affirmed.

BAZELON, Chief Judge, dissenting:

On the afternoon of August 21, 1970, the appellant, Lloyd Grover, and Jessie Toliver, a longtime acquaintance, engaged in what started as a friendly dice game at the home of appellant's mother. The game ended in a fight; Grover struck Toliver in the face. An hour and

the conflict." (note 5, *supra*). That wording is possibly less likely to raise the ambiguity noted by defense counsel.

10. Concededly it was appellant who was the aggressor at the earlier occurrence, the one-punch incident during the dice game.

11. We reject appellant's remaining contention that the trial court erred in admitting evidence that he was carrying fourteen extra cartridges in his pocket at the time of the shooting. This evidence, fleshing out the picture of appellant's state of mind from the events immediately prior to the shooting, was relevant to the issue of malice. Appellant contended that his actions were motivated by concern for the safety of his mother and sister. Yet the evidence showed that appellant's trip to and from his residence—barely three blocks from his mother's house—took approximately one hour. There was also evidence that appellant had taken the trouble to secure a towel. These circumstances permitted an inference of careful preparation and cast doubt upon his asserted intent to return immediately to protect his mother and sister. Evidence that appellant cached extra ammunition in his pocket could legitimately

substantiate the Government theory that appellant, seeking a show-down with the deceased, was the likely aggressor in the street encounter.

The Government has called our attention to a point not raised by appellant's counsel. In the course of his instructions on malice, the court charged:

In determining whether a wrongful act is intentionally done and is, therefore, done with malice aforethought.

. . . . .

That passage is virtually identical to the instruction disapproved in Green v. United States, 132 U.S.App.D.C. 98, 405 F.2d 1368 (1968), as inaccurately equating malice with an intentional act. However, in the second *Green* case, 137 U.S.App.D.C. 424, 424 F.2d 912 (1970), cert. denied, 400 U.S. 997, 91 S.Ct. 473, 27 L.Ed.2d 447 (1971) and in Mitchell v. United States, 140 U.S.App.D.C. 209, 434 F.2d 483 (1970), we held that errors of this sort were non-prejudicial when accompanied by other instructions that correctly defined malice by emphasizing the requisite "man-endangering" state of mind. The totality of the instructions on malice in the present case likewise render the error harmless.

a half later, the two met on a nearby street. The appellant admits that he shot and killed Jessie Toliver. He asserts that the killing was justified because Toliver was advancing on him with a knife, and that he acted in self-defense. At appellant's trial for second degree murder, some evidence was presented that tended to support his version of the event. Other evidence tended to show that Toliver was retreating when the fatal shots were fired.

The critical question for the jury was whether appellant or Toliver was the aggressor when they met one another on the street. The question in this appeal is whether, in fact, the jury made this critical determination, or whether, because of an ambiguous instruction from the trial court, it focused instead on the earlier fight that concluded the dice game in deciding that Grover was criminally responsible for Toliver's death.

The trial court instructed the jury that "the defense of self-defense is not available to one who provokes the difficulty." The majority grants that, given the facts of this case, an ambiguity inheres in this instruction. The jury might well have assumed that "the difficulty" to which the trial judge referred encompassed the earlier fight following the dice game. They might well have taken the instruction to mean that, as a matter of law, appellant's blow in the earlier encounter triggered a continuous series of events leading to Toliver's death. They might well have supposed, erroneously, that the legal pendulum mechanics governing self-defense required them to find the appellant guilty if they found him the aggressor in the earlier encounter.

The majority admits this possibility, and then dismisses it as "gossamer." It contends that the contested portion of the instruction, while ambiguous in the abstract, was clear in the context of the instruction as a whole. I cannot agree. On the contrary, I find nothing in the instruction that cures the ambiguity. Earlier in the instruction the trial court said:

If the defendant did not provoke the assault and at the time of the occurrence had reasonable grounds to believe . . . that the decedent was about to take his life . . . the defendant was not required to retreat . . . .

It need hardly be said that, according to standard rules of grammar and ordinary understanding, the phrase "at the time of the occurrence" modifies only the subsequent part of the sentence. Indeed, the placement of the phrase implies a distinction between the time of the provocation and the time of the shooting. The ambiguity remains. If anything, it is reinforced by the remainder of the instruction.

The majority further contends that the earlier altercation "did not loom large at trial." This is true enough; but, of course, the defendant in no way disputed that it had taken place. There is no question that evidence of the earlier fight was presented to the jury. It figured prominently in the appellant's own testimony. Moreover, the Government emphasized it in its closing remarks:

Who, ladies and gentlemen, actually struck the first blow? Who was it in the house, according to Grover's own testimony, that struck out at a man sitting at a table, this man of peace who struck out at a man sitting at the table . . . ?

This remark emphasizing the earlier encounter—an emphasis entirely consistent with the erroneous rule of law that the charge suggests—dissolves any lingering doubt that the ambiguity in the charge had a prejudicial effect.

Nonetheless, the majority concludes "that the verdict reflects the jury's crediting the prosecution witnesses who testified that the fatal shot came when the appellant's gun was advancing and firing on the retreating knife of the deceased." I confess that I do not have the powers of divination with which the majority is apparently blessed. I do not know what the crucial determinant of the jury's verdict might have been. I do not know whether the jury was misled

by the charge. But I think there is a significant possibility that it was. It is one thing for judges, trained in the law, to read an instruction "in context," and to derive from it an accurate, if not entirely clear, statement of the law applicable to the facts. It is quite another to assume that juries of laymen can do the same.

Our system of determining guilt operates on the assumption that juries will apply the law they are given—tempered, perhaps, by their own sense of justice— to the facts that they find. It is essential that the trial court clearly and accurately set forth the law governing the case: ". . . the responsibility for instructing as to the elements of the offense rests with the judge." Green v. United States, 132 U.S.App.D.C. 98, 405 F.2d 1368, 1370 (1968). The trial court here failed in this vital task.*

In the interest of justice, Lloyd Grover's conviction of second degree murder should be reversed. He should be afforded a new trial. His guilt should be determined by a jury fully informed of the facts, accurately and unambiguously informed of the law, not by a guessing game played under the rubric of harmless error. I dissent.

---

* Defense counsel pointed out the ambiguity to the trial court and requested clarification; the trial court declined to supply it. This is not a case, therefore, in which counsel failed to call the court's attention to the problem—even assuming that such failure would in any way affect the proper result. See Green v. United States, supra; Belton v. United States, 127 U.S.App.D.C. 201, 382 F.2d 150, 157 (1967) (Bazelon, C. J., dissenting).