Cornell A. RORIE, Appellant,

v.

UNITED STATES, Appellee.

Nos. 96–CF–363, 03–CO–949.

District of Columbia Court of Appeals.

Argued June 21, 2005.

Decided July 28, 2005.

Andrew G. Ferguson, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Patricia A. Heffernan, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, and John R. Fisher and Terence J. Keeney, Assistant United States Attorney, were on the brief, for appellee.

Before REID, GLICKMAN and WASHINGTON, Associate Judges.

REID, Associate Judge:

Appellant Cornell A. Rorie was indicted on a charge of second-degree murder while armed (knife), in violation of D.C.Code § 22–2403, –3202 (1996),[1] but was convicted by a jury of the lesser-included offense of voluntary manslaughter while armed. He contends primarily that the trial court committed reversible error by giving the jury a "first aggressor" or provocation charge, because "[n]o evidence showed that Mr. Rorie either verbally or physically provoked [the decedent] in the moments before the [fatal] incident." We hold that in giving the challenged instruction to the jury the trial court committed error, and that error was not harmless. Consequently, we reverse the trial court's judgment and remand the case for a new trial.

---

1. Recodified at D.C.Code § 22–2103, –4502 (2001).

## FACTUAL SUMMARY

The evidence presented by the government shows that Renee Lewis, leased a one-bedroom apartment in the 700 block of Brandywine Street, in the Southeast quadrant of the District of Columbia, in early August 1994; Rafael Solice,[2] her boyfriend, moved into the apartment with her. Sometime around mid-August 1994, Ms. Lewis' girlfriend, Terry Price and Ms. Price's boyfriend, Mr. Rorie, rented the living room of Ms. Lewis' apartment. In addition, Ms. Price and Mr. Rorie used a large walk-in closet for their possessions.

A morning stabbing at the apartment on October 2, 1994, led to the prosecution of Mr. Rorie. At his trial, government witnesses Lewis and Price, and defense witness Rorie recounted the events of that morning. According to Ms. Lewis' testimony, during the early morning hours of October 2, 1994, just as she and Mr. Solice were preparing to go to sleep around 3 a.m., Ms. Price called Mr. Solice. Ms. Lewis responded to Ms. Price's call and upon entering the living room observed Ms. Price and Mr. Rorie "arguing." Ms. Price wanted Mr. Rorie to leave the apartment and Mr. Solice "to take her somewhere." Mr. Rorie "went into the closet and ... started taking out some of his clothes and stuff and he ... told [Ms. Price] that she was going with him also, that if he had to leave she was leaving too." Ms. Price "said something smart or something to him," so Mr. Rorie "grabbed her ... throat" and began to choke her. Ms. Lewis "hollered" at Ms. Price and Mr. Rorie to stop their confrontation. Upon hearing the hollering, Mr. Solice emerged from the bedroom.

Mr. Solice "started arguing and telling [Mr. Rorie and Ms. Price] he's getting tired of this sh-t and he's not going to have it [in the apartment]." Mr. Solice told Mr. Rorie "to leave ... and [Mr. Rorie] was trying to explain to him what was going on." Mr. Solice "kept telling [Mr. Rorie] he didn't want to hear it. So [Mr. Solice] got mad and reached over in the corner and grabbed the [baseball] bat." Mr. Solice and Mr. Rorie exchanged words. Mr. Solice "started swinging the bat" and Mr. Rorie "backed up." Ms. Lewis was just behind Mr. Rorie. Mr. Solice "kept swinging the bat" and Ms. Lewis told him "to stop." Mr. Solice continued to say, "he's getting tired of this, he's not going to have it ...." He told Mr. Rorie and Ms. Price "to get out...." Mr. Solice "was getting ready to swing" the bat again when Mr. Rorie "pulled a knife out of his pocket." Mr. Solice "hit the glass table." Ms. Lewis replied, "no," when asked whether Mr. Rorie "at that time ... ma[d]e any motion at all with the knife."

Mr. Solice instructed Ms. Lewis "to call the police." As she turned to leave to call the police, Ms. Lewis "hit [her] head on ... the door going out." She "ran ... to the apartment downstairs" but no one responded to her "banging on the door." When Ms. Lewis "felt like something was dripping," she put her hand to her head and discovered blood. At that point, she started back upstairs. Mr. Rorie "was in the hallway" and inquired "what was wrong" when he saw "the blood dripping from [her] head." The two proceeded back to the apartment, and Mr. Rorie called Mr. Solice "to tell [him] that [Ms. Lewis] was bleeding." Mr. Solice responded, "man, I told you don't knock on my door, leave me alone. I ain't going to tell you no more." Mr. Rorie tried to explain

2. Mr. Solice's last name also appears in the record as "Solis" and his first name as "Raphael."

that Ms. Lewis was bleeding. Eventually both Ms. Price and Mr. Solice went to the bedroom to check on Ms. Lewis. Mr. Solice accused Mr. Rorie of cutting Ms. Lewis. Ms. Lewis pointed out that she hit her head on the door.

Later, Ms. Price and Mr. Solice left the apartment "to get some money so they [could] get high, so maybe everything will calm down." Around 5:30 or 5:45 a.m., Ms. Price and Mr. Solice returned to the apartment. Mr. Solice had a rock which "he shared with [Ms. Lewis]" in their bedroom. Mr. Rorie continued to rest in the living room, with Ms. Price. Soon, Ms. Price called Mr. Solice. "She said that [Mr. Rorie] was messing with her again." Mr. Solice left the bedroom, followed by Ms. Lewis. Ms. Lewis "heard [Mr. Solice] and [Mr. Rorie] ... passing words," but "didn't hear exactly what [Mr. Solice and Mr. Rorie were] saying at the time." Both men went outside, followed by Ms. Lewis. Mr. Rorie said to Mr. Solice, "come on, man, what you going to do, I'm outside now." Ms. Lewis told Mr. Rorie, "leave it alone ..., just leave it alone. Come on back in here."

Mr. Rorie and Ms. Lewis proceeded back to the apartment. Ms. Lewis and Ms. Price went into the Lewis/Solice bedroom. Mr. Rorie, who was in the living room, "kept telling [Ms. Price] that he wanted to talk with her." Ms. Lewis informed Mr. Rorie that Mr. Solice did not want him in his bedroom. Mr. Rorie persisted in saying he wanted to talk with Ms. Price. Ms. Price "kept saying she didn't want to talk to him and [Ms. Lewis] kept saying why don't you go ahead and talk to him, so we can try ... [to] ... get this stuff over with...." Ms. Price finally went to the living room around 6:30 or 7:00 a.m., on October 2, 1994.

After Ms. Price left the Lewis/Solice bedroom, Ms. Lewis "dozed off" but sud-denly heard Ms. Price call her. She got up to respond to Ms. Price's call, and Ms. Price asked her to get Mr. Solice because Mr. Rorie "is trying to kill my baby ...." When Ms. Lewis entered the living room, she saw Mr. Rorie "leaning over the top of [Ms. Price] with the knife. She was in the bed" and "on her back." Ms. Price said, "please go get [Mr. Solice]." Ms. Lewis "went out in the hall and ... waited." When she returned to the apartment after "about five minutes," Mr. Rorie was no longer on the living room bed and was dressed; Ms. Price still was in bed in her night clothes. As Ms. Lewis "was on her way toward [her] bedroom," Mr. Solice entered the apartment.

Mr. Rorie "asked [Mr. Solice] was he still going to take him home. [Mr. Solice] said I ain't taking you a damn place, you get there the best way you know how." In response to Mr. Solice's instruction to Ms. Lewis, she left the apartment "to go call the police." Mr. Rorie "was still in the living room and [Mr. Solice] was heading toward the bedroom." Ms. Lewis finally found a telephone on the street and placed a call to the police. As she was returning to her apartment, she saw "a police car pulling up" and ran toward it. Ms. Price was outside the apartment building. Although she was instructed not to enter the apartment, Ms. Lewis peered in and could see Mr. Solice "not moving or saying anything." He had been stabbed by Mr. Rorie.

Unlike Ms. Lewis who was not in the apartment when Mr. Solice was stabbed, Ms. Price, another government witness, was there but did not actually see the stabbing. Ms. Price did not remember specific dates and essentially testified according to events. In the "early morning" of October 2, 1994, Ms. Price saw Mr. Rorie with a knife. She "was laying down" and "[h]e was packing." Mr. Rorie was

talking to [her] and packing at the same time. He said, "you ain't doing nothing but killing your baby...." At the time, Ms. Price was pregnant with Mr. Rorie's child. She had decided to go out to purchase more cocaine.[3] Mr. Rorie "grabbed [Ms. Price] by [her] collar." He told her she "wasn't going [anywhere]...." She informed Mr. Rorie that she "wanted him to leave" and that if he didn't go, she "was leaving." Mr. Rorie "said if he was going to leave that [she] was leaving, [she] was going with him."

At some point after the collar incident, Mr. Solice "had a bat and he was swinging [it] at [Mr. Rorie] but he broke the glass table in the process ...." Mr. Rorie "kept backing up ... [as] [Mr.] Solice [was] swinging the bat at him." After the bat swinging incident, Ms. Lewis went out to call the police. She "hit her head" on the door and Mr. Rorie "was trying to tell [Mr. Solice] that Ms. Lewis got hurt" when she bumped her head on the door. Mr. Solice and Ms. Price "put[ ] cold water and stuff on [Ms. Lewis'] head" and then Ms. Price went out with Mr. Solice to purchase cocaine.

Eventually, Mr. Solice and Ms. Price returned to the apartment with the cocaine. Mr. Solice and Ms. Lewis smoked cocaine in their bedroom. At some point Mr. Rorie "was getting loud," so Mr. Solice "went and slept in the van." Ms. Price "went in the [bedroom] with [Ms. Lewis] and finished smoking [the cocaine she] had[,]" with Ms. Lewis. While the women were in the bedroom, Mr. Rorie "knocked on the door telling [Ms. Lewis] that he wanted to talk to [Ms. Price] but [she] wouldn't come out the room." Later, Ms. Price left the Lewis/Solice bedroom, went to the living room, and "laid down."

Some time after sunrise, Mr. Rorie "grabbed [Ms. Price] and pushed [her] down, made [her] lay down. Mr. Rorie was [s]tanding directly in front of Ms. Price .... He had a knife in his hand." Ms. Price called Ms. Lewis. When Ms. Lewis entered the living room, Ms. Price told her "to go get [Mr. Solice]." When Mr. Rorie saw Mr. Solice, he asked, "was he going to help him move his stuff back across town. And [Mr. Solice] said if anything I [will] sit your sh-t in the hallway." And he said, "you couldn't be no man because you beat on a woman." Mr. Rorie continued to remove his things from the walk-in closet.

While she was still in the living room, Ms. Price "heard Mr. [Solice's] footsteps come out the Lewis/Solice bedroom. And [she] heard some[thing] like bumping," which to her meant that the two men "had got into it." Eventually Ms. Price got up and saw "both [men] in the hallway." Mr. Rorie's "back was toward the walk-in closet. And [Mr. Solice's] back was towards the linen closet." It "look[ed] like both of them was shoving each other." That is, "they was pushing back off each other."

Ms. Price noticed that Mr. Solice "had eased back into the bedroom and was pushing the door closed." Ms. Price entered the bedroom and observed that Mr. Solice "had slid down in the corner." He was "bleeding." Blood was "on his shirt" and "in the corner." She ran to call the police and an ambulance.

During his testimony for the defense, Mr. Rorie stated that early on the morning of October 2, 1994, around 3:00 a.m., he had an argument with Ms. Price over "[h]er attempt to purchase drugs." He tried to physically prevent her from leaving the apartment and a loud argument broke out. Mr. Solice asked both Ms.

---

**3.** Ms. Lewis had purchased crack cocaine on the evening of October 1, 1994.

Price and Mr. Rorie to "lower [their] voices." Ms. Price did not do so. When Mr. Solice again asked that they lower voices, Mr. Rorie "grabb[ed] [Ms. Price] and [threw] her on the couch." Mr. Solice then got the baseball bat and "beg[a]n to tackle [Mr. Rorie] . . . [b]y swinging it." Mr. Rorie "jumped backwards" and Mr. Solice missed him. A second effort by Mr. Solice to hit him with the bat also failed. When Mr. Solice tried a third time by raising the bat over his head in preparation to strike, Mr. Rorie "grabbed the bat" and held it immobile over Mr. Solice's head. He asked Mr. Solice if he realized what he was doing, and then slowly let go of the bat. As Mr. Rorie began walking away, he "heard a loud smashing sound." When Mr. Rorie turned to investigate, he "saw [Mr. Solice] standing over the top of the table with the bat in his hand." Mr. Solice had broken the glass table in the living room. Mr. Rorie got his knife, which he kept on the floor by his nightstand while sleeping, but did not use it. He "backed" away.

Ms. Lewis then left the apartment, followed by Ms. Price. When Ms. Price called Mr. Rorie, he exited the apartment, "proceeded . . . to the 2nd floor landing . . . [where he] saw Ms. Price bending over Ms. Lewis . . .; blood [was] dripping from [Ms. Lewis'] forehead." Mr. Rorie returned to the apartment to inform Mr. Solice that Ms. Lewis was hurt. Mr. Solice told Mr. Rorie, "don't say sh-t to me." As Mr. Rorie attempted to explain that Ms. Lewis was hurt, Ms. Price called Mr. Solice. Mr. Solice accused Mr. Rorie of being "the cause" of Ms. Lewis' injury. After about "10 to 25 minutes," Mr. Solice left the bedroom, "pick[ed] up the bat and [announced] . . . that [he was] going to get [his] sh-t." He ignored Mr. Rorie's instruction to "leave [his] bat." Mr. Rorie followed him "to see what he was going to do." Mr. Rorie invited Mr. Solice "to

come on with what he intended to do, . . . to proceed with it." Nothing happened and Mr. Rorie went back inside the apartment. Approximately 10 to 15 minutes later, Mr. Solice "returned to the apartment."

Some five minutes later, Mr. Solice and Ms. Price left the apartment to "[p]urchase some drugs." Mr. Rorie "went into the [walk-in] closet to begin [to] pack his things." He also had a conversation with Ms. Lewis. After "[r]oughly one hour to 90 minutes, 120 minutes," Mr. Rorie noticed that Ms. Price and Mr. Solice were returning. He left Ms. Lewis' bedroom and went to the living room bedroom. Ms. Price and Mr. Solice proceeded to the Lewis/Solice bedroom where they remained for "approximately 35 or 45 minutes." "[B]etween 5:30 and six o'clock," Mr. Solice emerged from the bedroom and left the apartment. As he left, Mr. Rorie asked whether he was going to go to work that morning. Mr. Solice was non-committal.

Approximately "10 minutes after Mr. Solice left the apartment," Mr. Rorie knocked on the Lewis/Solice bedroom door to find out "what Ms. Price was doing." Ms. Price left the Lewis/Solice bedroom momentarily but returned and remained there for "approximately 60 to 90 minutes." Around 7:30 or 7:45 a.m., Ms. Price emerged from the bedroom and crossed to the living room where she and Mr. Rorie engaged in conversation. Mr. Rorie discussed her pregnancy and drug use, and her tendency to ask Mr. Solice to intervene when she and Mr. Rorie argued. Mr. Rorie "had full control of the conversation . . . [and] was doing the talking" while Ms. Price listened. "After [Ms. Price] reached a point where she no longer wanted to listen to what [Mr. Rorie] had to say," she called out for Ms. Lewis. Mr. Rorie acknowledged that he was holding his knife

in his hand, but claimed that he had taken it out of his pocket to avoid "damaging anything that was on the bed." Ms. Lewis came into the living room and said, "you two are about to have a baby, ya'll need to calm down and get control of what's going on, ya'll need to get ya'll self together." Ms. Price asked Ms. Lewis to get Mr. Solice because "she [Ms. Price] was ready for [Mr. Rorie] to leave."

Mr. Solice entered the living room, asked Ms. Lewis to call the police, and told Mr. Rorie, "get your sh-t and get out of here, you going to jail." Mr. Solice returned to his bedroom, and Mr. Rorie went to the walk-in closet. As he was going into the walk-in closet, Mr. Solice said, "punk mother f—ker, punk mother f—ker, you can't be no man, you don't do nothing but beat on women[.] I should kill your mother f—king a—." Mr. Rorie "ignored [Mr. Solice's words] and proceeded inside the closet." He began to remove his things, including his construction tools, and placed them outside the closet, on the floor. He called Ms. Price but received no answer. When he took a shirt from the closet and "lean[ed] over to put the shirt down[,]" outside the closet, Mr. Solice appeared, "grab[bed Mr. Rorie] by [his] neck and proceed[ed] to choke him against the wall...." Mr. Rorie asked Mr. Solice "what [he was] doing." Mr. Solice did not respond and continued to choke Mr. Rorie. Mr. Rorie "felt like [he] was beginning to die." He stated: "It felt like my eyes were beginning to pop out of my head. Felt like my veins were bulging. And I was beginning to lose consciousness .... [He] was blacking out [and] going numb." Mr. Rorie "reach[ed] for his knife." He "grabbed the knife by the blade" and turned it around. He then "blacked out."

When Mr. Rorie regained consciousness, Mr. Solice was still "choking [him] and banging [Mr. Rorie's] head up against the wall." Mr. Rorie "struck [ Mr. Solice] with the knife." Mr. Solice continued to choke him. So, Mr. Rorie "struck him again." [4] Mr. Solice released his choking hold and began "to back up" moving toward his bedroom. He opened the door of the bedroom and went in. Mr. Rorie "saw [Mr. Solice] standing in the middle of the room holding himself." Mr. Solice backed himself to a corner of the room and "slid down the wall."

Mr. Rorie asserted that prior to October 2, 1994, Mr. Solice had attacked him with a hammer after an argument between Ms. Price and Mr. Rorie. On another occasion, Mr. Solice pushed him after Mr. Rorie "had tossed a fork in the kitchen." Mr. Rorie claimed that during both incidents he had "maintained physical restraint...."

## ANALYSIS

### The First Aggressor/Provocation Jury Instruction Issue

Mr. Rorie argues that the trial court's "first aggressor"/provocation jury instruction constituted error because "[n]o evidence showed that Mr. Rorie either verbally or physically provoked [Mr. Solice] in the moments before the final incident." Thus, "[w]ithout facts to support that Mr. Rorie was the aggressor or provocateur *toward Mr. Solice* in the moments before the stabbing, the jury necessarily had to take into account prior, unrelated, and prejudicial acts of Mr. Rorie *toward Ms. Price* simply to make sense of the language in the instruction [emphasis in original]." The government generally supports the trial court's conclusion that the "first aggressor"/provocation instruction was ap-

---

**4.** A medical examiner testified that Mr. Solice's body had four stab wounds. Mr. Rorie could not explain the two additional stab wounds.

propriate in light of "this entire case from the time the curtain opens until the curtain closes on decedent's life." Furthermore, the government asserts that any challenge to "the wording of the instruction, raised for the first time [on appeal] [should be] reviewed for plain error only."[5]

The trial court first broached the issue of a self-defense jury instruction at the end of the day on September 13, 1995, after the government had completed its main case and the defense had finished its direct examination of Mr. Rorie. The court informed counsel that it planned to give criminal jury instruction 5.12, "Self-defense—General Considerations" and 5.13, "Self-defense—Amount of Force Permissible." The trial court also stated: "I suppose that [we] will have to consider where defendant might have been the aggressor which is 5.16 and that calls into play A and B."[6] During the trial court's discussion of September 14, 1995 with defense and government counsel, the defense objected to the giving of instruction 5.16(A) and (B). In explanation of her objection, defense counsel stated: "[W]e believe that there is no testimony ... that my client was the aggressor in this case at the time of the stabbing. Now, I know that the court ... heard [Ms.] Price say that the footsteps came from the direction where my client was." The trial court interrupted to say, in part:

But there's so much more than that. That's just one isolated bit. You have to look at the whole context .... If you look at this entire case from the time the curtain opens until the curtain closes on the decedent's life, you have a picture of— a rather chaotic situation and through the night, through the night there were disputes off and on between the defendant and his girlfriend with interventions at the behest of his girlfriend from the decedent.

There is considerable testimony .... Testimony from the girlfriend and the defendant and to an extent from the first witness in this case ... that in the final moments— moments leading up to the final confrontation and then until the confrontation was over, the defendant had the murder weapon in his hand. Reasonable people could conclude that he was behaving in an aggressive manner.

Then you have a moment before the fatal fight. You have testimony undisputed that the decedent uttered words ... which could only be considered as highly provocative, particularly if the hearer is someone whose senses have already been heightened ... to something that could probably be described from this evidence as a scathing rage. Someone who is torn between leaving

---

**5.** Given our disposition, we do not reach the government's plain error argument relating to the wording of the self-defense jury instruction.

**6.** CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA (4th ed.), Instruction 5.16 provides in pertinent part:

 A. WHERE DEFENDANT OR COMPLAINANT MIGHT HAVE BEEN AGGRESSOR
 [There has been testimony both that the complainant was the aggressor and that the defendant was the aggressor. You must

first determine from the evidence whether, in fact, the defendant was the aggressor.]
 B. MERE WORDS NOT PROVOCATION
 If you find that the defendant was the aggressor, or if s/he provoked the conflict upon himself/herself, s/he cannot rely upon the right of self-defense to justify his/her use of force. One who deliberately puts himself/herself in a position where s/he has reason to believe that his/her presence will provoke trouble cannot claim self-defense. Mere words without more by the defendant, however, do not constitute aggression or provocation.

and staying and whose determination is if I leave she goes with me, and who is being told, get out, get out, get the police, get him out. And then the words that we have heard using the curse words, the epithets and then the ultimate challenge to manhood . . . .

Defense counsel responded: "Okay.[7] We would ask for 5.14(b) . . . amount of force permissible where appearances are false." Ultimately the trial court agreed to give criminal jury instruction 5.14(B) [deadly force], 5.17(A)(1) [defendant's awareness of specific acts of violence by the decedent], and 5.17(C) [threats by the decedent against the defendant].

The trial court decided *sua sponte* to give instruction 5.16(A) and (B). During the court's discussion of Instruction 5.16, the government remained silent, but the defense objected. Given this background, the critical issue presented for our consideration in this case is whether, in its instruction regarding the right of self-defense, the trial court appropriately included a charge relating to the defendant as "the aggressor" or the defendant as the person who "provoked the conflict upon himself," despite the explicit objection of defense counsel and the absence of any request by the government. We begin our discussion by setting forth the general and specific legal principles which guide our analysis.

■■■■ "In reviewing claims of instructional errors, we consider the instructions as a whole." *Williams v. United States*, 858 A.2d 984, 995 (D.C.2004) (citing *Hunt v. United States*, 729 A.2d 322, 325 (D.C. 1999)). " '[I]t is axiomatic that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' " *Id.*

(quoting *Dickerson v. United States*, 620 A.2d 270, 273 (D.C.1993)). "A defendant is entitled to a jury instruction on a 'theory of the case that negates his guilt of the crime charged' if the instruction is supported by 'any evidence, however weak.' " *Graves v. United States*, 554 A.2d 1145, 1147 (D.C.1989) (citations omitted). Furthermore, "an instruction to the jury must 'properly inform [it] of the applicable principles involved.' " *Hernandez v. United States*, 853 A.2d 202, 207 (D.C.2004) (quoting *Stewart v. United States*, 687 A.2d 576, 579 (D.C.1996)).

■■■■ " '[T]he law of self-defense is a law of necessity'; the right of self-defense arises only when the necessity begins, and equally ends with the necessity." *United States v. Peterson*, 157 U.S.App.D.C. 219, 226, 483 F.2d 1222, 1229 (1973) (quoting *Holmes v. United States*, 56 App. D.C. 183, 188, 11 F.2d 569, 574 (1926) (footnotes omitted)). Thus, to be entitled to the defense of self-defense, the record must reflect that:

> (1) there was an actual or apparent threat [to the defendant]; (2) the threat was unlawful and immediate; (3) the defendant honestly and reasonably believed that he was in imminent danger of death or serious bodily harm; and (4) the defendant's response was necessary to save himself from danger.

*Hernandez, supra*, 853 A.2d at 205 (citations omitted). Where the defendant asserts a defense of self-defense, if "there is sufficient evidence to justify a self-defense instruction, the burden is on the government to disprove self-defense, by meeting its burden of proof negating the defendant's subjective actual belief or objective reasonableness." *Swann v. United States*,

7. On this record we do not interpret defense counsel's "Okay" to mean that counsel abandoned her objection to Instruction 5.16(B).

648 A.2d 928, 930 n. 6 (D.C.1994) (citations omitted). In that regard, "[w]hat the fact-finder must determine to return a verdict of guilty is prescribed by the Due Process Clause." *Sullivan v. Louisiana*, 508 U.S. 275, 277, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). "The prosecution bears the burden of proving all elements of the offense charged, and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements." *Id.* at 277–78, 113 S.Ct. 2078 (citations omitted). But, "a defendant cannot claim self-defense if 'the defendant was the aggressor, or if s/he provoked the conflict upon himself/herself.'" *Swann, supra,* 648 A.2d at 930 n. 7 (citation omitted). In other words:

> The fact that the deceased struck the first blow, fired the first shot or made the first menacing gesture does not legalize the self-defense claim if in fact the claimant was the actual provoker. In sum, one who is the aggressor in a conflict culminating in death cannot invoke the necessities of self-preservation. Only in the event that he communicates to his adversary his intent to withdraw and in good faith attempts to do so is he restored to his right of self-defense.

*Peterson, supra,* 157 U.S.App. D.C. at 228, 483 F.2d at 1231 (footnotes omitted). Thus, the fact that a defendant may have been an aggressor or a provocateur at an earlier point in time, does not by itself rule out a defense of self-defense. Indeed, "it would ... be[ ] error to deny an otherwise established claim of self-defense solely because [the defendant] had previously taken aggressive action toward [the decedent]." *United States v. Grover,* 158 U.S.App. D.C. 260, 264, 485 F.2d 1039, 1043 (1973). This is so where there is evidence of a "disengagement" due to the passage of time, and "[t]he effect of the disengagement of the parties and the passage of ... time ... restore[s] them to the *status quo ante.*"

*Id.* Thus, "any disability on [the defendant] because of his prior aggression [is] lifted, and he [is] able to defend himself against any subsequent attack." *Id.*

 We have not previously encountered a case like this one where the trial court decides, *sua sponte* and over the express objection of the defendant, to give criminal jury instruction 5.16(B), relating to the defendant as "the aggressor" or as the person "who provoked the conflict upon himself." In rejecting the objection of defense counsel, the trial court focused on "the whole context," that is, "the entire case from the time the curtain open[ed] until the curtain clos[ed] on the decedent's life ...." According to the trial court, "the whole context" included (1) "disputes off and on between the defendant and his girlfriend with interventions at the behest of his girlfriend from the decedent"; (2) the fact that "in the ... moments leading up to the final confrontation and then until the confrontation was over, the defendant had the murder weapon inn his hand"; (3) "testimony undisputed that the decedent uttered words ... which could only be considered as highly provocative ...."; (4) the defendant's "determination ... [that] if I leave she [Ms. Price] goes with me"; (5) instructions to Mr. Rorie from Mr. Solice to "get out, get out" and to Ms. Lewis to "get the police"; (6) "the words that we have heard using the curse words, the epithets and then the ultimate challenge to manhood."

 The trial court's view of "the whole context" is inconsistent with fundamental legal principles in the law of self-defense pertaining to "the first aggressor" or provocation. Although criminal jury instruction 5.16(B) specifically states that "[m]ere words without more by the defendant ... do not constitute aggression or provocation," the trial court used as a par-

tial justification for giving the instruction words that constituted "epithets" and Mr. Rorie's "determination ... [that] if I leave she [Ms. Price] goes with me." Significantly also, the trial court overlooked the principle that: "[I]t would ... be[ ] error to deny an otherwise established claim of self-defense solely because [the defendant] had previously taken aggressive action toward [the decedent]." *Grover, supra,* 158 U.S.App.D.C. at 264, 485 F.2d at 1043. Hence, even though Mr. Rorie may at times have had a knife in his hands during the early morning of October 2, 1994, that alone does not suggest that the aggressor/provocation jury instruction was appropriate on the facts of this case.[8] Where the record contains evidence of disengagement and the passage of time, "[t]he effect of the disengagement of the parties and [the] passage of ... time ... restore[s] them to the *status quo ante.*" *Grover, supra,* 158 U.S.App.D.C. at 264, 485 F.2d at 1043.

The record before us shows that there was disengagement after the first two episodes. The government's key witnesses, Ms. Lewis and Ms. Price, and the defense's primary witness, Mr. Rorie, gave similar material testimony showing discrete episodes within three different time frames in the early morning hours of October 2, 1994, and that after each of the first two episodes, Mr. Rorie and Mr. Solice "disengaged" and a block of time passed. The first episode took place around 3:00

a.m. It began with an argument between Ms. Price and Mr. Rorie over her desire to leave the apartment to purchase more drugs despite her pregnancy. When Mr. Rorie sought to restrain Ms. Price physically by grabbing her throat and choking her (Ms. Lewis' testimony), or grabbing her by the collar (Ms. Price's account), or throwing her on the couch (Mr. Rorie's testimony), Mr. Solice confronted Mr. Rorie with a baseball bat and began swinging it at Mr. Rorie. He missed when Mr. Rorie jumped out of the way each time. Mr. Rorie took out his pocket knife when Mr. Solice began to swing the bat the third time, but did not attempt to use it. Mr. Solice ended up smashing the glass table in the living room. There is evidence in the record that disengagement from this episode took place when Mr. Solice and Ms. Price left the apartment to purchase cocaine.

The second episode occurred around 5:30 a.m. According to Ms. Lewis, Mr. Solice and Ms. Price returned from purchasing cocaine about an hour to one and one-half hours after leaving, and smoked it. While Ms. Price was in the living room bedroom with Mr. Rorie, she called Mr. Solice, complaining that Mr. Rorie "was messing with her again." Mr. Solice and Mr. Rorie exchanged words, went outside, and had more words, during which Mr. Rorie said to Mr. Solice, "come on, man, what you going to do. I'm outside now." There was no testimony that Mr. Rorie

---

8. Mr. Rorie also testified that he used the knife in the course of his construction work. But this case is not exactly like *(Kalani) Williams v. United States,* No. 03–CF–1177, 877 A.2d 125 (D.C.2005), 2005 D.C.App. Lexis 322, where the victim "carried [a] knife ... strictly as a tool of the trade; and on no previous occasion had [the victim] been shown to use a weapon in threatening or assaulting anyone." *Id.* 877 A.2d at 128, 2005 D.C.App. Lexis 322 at *6–7 (citing *Edwards v. United States,* 721 A.2d 938, 942

(D.C.1998)) ("rejecting self-defense claim altogether where victim had no weapon in his hands, even though defendant had seen him earlier that day holding a knife in an unrelated altercation."). In *(Kalani) Williams,* we held that: "The judge did not abuse [his] discretion in concluding that [the victim's] mere possession of the pocketknife shed too little light on his alleged willingness to provoke a dangerous fight to outweigh the risks of jury confusion and speculation attendant on admitting it."

displayed his knife at that time, or took any other provocative action against Mr. Solice. In fact, Mr. Rorie returned to the apartment at Ms. Lewis' urging to "leave it alone" and to go inside, manifesting disengagement from his verbal exchange with Mr. Solice. Furthermore, Ms. Price, who was not certain of time lines, recalled that after she and Mr. Solice returned to the apartment from purchasing cocaine, Mr. Rorie "was getting loud" and Mr. Solice "went and slept in the van." Mr. Rorie stated that sometime "between 5:30 and six o'clock" Mr. Solice emerged from his bedroom and went outside. When Mr. Solice was on his way outside, Mr. Rorie asked whether he was going to work that morning and Mr. Solice did not answer the question. There was evidence, then, that further disengagement from the second episode occurred when Mr. Solice left the apartment to sleep in his van. Based upon the legal principle concerning disengagement and the passage of time, then, the relevant context for the trial court's evaluation of the self-defense evidence with respect to the appropriateness of charging instruction number 5.16(B) was the final episode which occurred sometime between 6:30 and 7:30, or after sunrise. Instead, the court focused its justification for giving instruction 5.16 *sua sponte* on much earlier events, including the 3 a.m. and 5:30 a.m. episodes.

Even when one examines the testimony relating to the final episode, the government's own evidence did not support the giving of instruction 5.16. It showed no basis for inferring that Mr. Rorie provoked a fight with Mr. Solice during the final episode, which unfolded sometime between 6:30 and 7:30 a.m., or after sunrise. The government presented no witness who saw the actual stabbing. Mr. Rorie provided his own version of the final episode. Mr. Rorie stated that he "had full control of the conversation" he was having with Ms.

Price about her pregnancy and drug use, and her tendency to call Mr. Solice to intervene. He acknowledged that he had a knife in his hand but only because he had taken it out of his back pocket to avoid "damaging anything that was on the bed." After telling Mr. Rorie to gather his things and leave, and instructing Ms. Lewis to call the police, Mr. Solice cursed Mr. Rorie, accused him of beating on women, and then returned to his bedroom. Mr. Rorie proceeded to assemble his belongings. When Mr. Rorie leaned down to put a shirt on the floor, Mr. Solice approached and began to choke him. As he was losing consciousness, Mr. Rorie reached for his knife. He "felt like [he] was beginning to die," and that his "eyes were beginning to pop out of his head" and his "veins were bulging." When Mr. Solice continued to choke him, Mr. Rorie struck him once, but Mr. Solice continued with the choking and Mr. Solice struck him again. When he determined that Mr. Solice "might be dead," he informed Ms. Price. She discovered that Mr. Solice was still alive and Mr. Rorie instructed her to "call the police and tell them what happened."

Ms. Lewis was not in the apartment when the final episode occurred. Prior to the stabbing, Ms. Price heard Mr. Solice's footsteps as he left his bedroom, and then "bumping" which she interpreted as Mr. Rorie and Mr. Solice "[getting] into it." She did not immediately investigate. When she finally got up and went to the hallway, she saw "shoving." As she put it, "They look[ed] like both of them was shoving each other." That is, "they was pushing back off each other." Mr. Solice "eased back into [his] bedroom." When she looked into the bedroom, Ms. Price saw that Mr. Rorie "had slid down in the corner" and that there was blood "on his shirt" and "in the corner." She called the police.

Instead of focusing on Mr. Rorie's actions with respect to Mr. Solice, and analyzing whether there was evidence that he was the aggressor toward Mr. Solice, or whether he provoked the final confrontation between the two men, the trial court emphasized his behavior toward Ms. Price. Mr. Rorie's aggression toward a third party did not turn Mr. Rorie into an aggressor against or provocateur toward Mr. Solice. *See People v. Townes*, 391 Mich. 578, 218 N.W.2d 136 (1974); *State v. Wasson*, 54 Wash.App. 156, 772 P.2d 1039 (1989).[9] Furthermore, even if the trial court properly considered the episodes beginning at 3 a.m. on October 2, 1994, the testimony of the witnesses suggested that Mr. Solice was the aggressor toward Mr. Rorie. It was he who swung the bat three times at Mr. Rorie, ending by smashing the glass table in the living room. During that episode the evidence shows that while Mr. Rorie took out a pocket knife, he did not use it. Before the final episode, it was Mr. Solice who hurled provocative words at Mr. Rorie— cursing him, accusing him of not being a man because he beat a woman, and telling him, "I should kill your m-f-ing a—." In contrast, although Mr. Rorie had his knife the entire time on the early morning of October 2, 1994, he never used it against Mr. Solice. In sum, on this record we conclude that the giving of that instruction constituted error.

■ While there was evidence supporting an inference that Mr. Rorie provoked some hostility during the interaction of the parties (including Mr. Solice and Ms. Price) that morning, that evidence alone did not justify giving the "first aggressor" or provocation instruction. Rather, instruction no. 5.16(B) is appropriately given when there is both evidence of self-defense and evidence that the defendant provoked the aggression from which he was defending himself. Furthermore, where the giving of the instruction is technically incorrect, the error generally is harmless. However, under the rather unique circumstances of this case, where there are earlier discrete episodes of an aggressive, even violent nature, some of which do not involve both the victim and the defendant, the jury might well be confused by the earlier "provocative" behavior of the defendant that did not operate as a legal trigger of the final fatal confrontation between the victim and the defendant. That potential jury confusion, generated by the technically erroneous "first aggressor" instruction prejudices the defendant. Therefore, it is not harmless.

Our analysis is not yet complete, however, because we must now determine whether the trial error in giving the "first aggressor" instruction was harmless in the case before us. The standard that guides

9. Although the government in its brief describes both *Townes* and *Wasson* as "irrelevant case law from other jurisdictions," it "agree[s] with the fundamental principle supported by those cases that [Mr. Rorie's] prior aggression toward [Ms.] Price would not make him the first aggressor here." Nevertheless, the government argues that "[t]he state of affairs between [Mr. Rorie] and [Ms.] Price (which the instruction did not reference), was highly probative of [Mr. Rorie's] motive to attack the victim," and that Mr. Rorie's "behavior toward [Ms.] Price was powerful circumstantial proof that [Mr. Rorie] was the first aggressor as against the victim." Drawing such a conclusion of course required a reconstruction of the evidence. But the government used the evidence relating to Ms. Price in its rebuttal argument for different reasons. It attempted to demonstrate that Mr. Solice acted as "a peacemaker" not an aggressor. In addition, the government used the evidence relating to Mr. Rorie's actions toward Ms. Price to contend that Mr. Solice was not "assaulting" Mr. Rorie during the 3 a.m. baseball bat incident, thus suggesting to the jury that the 3 a.m. episode was relevant to determining who was the first aggressor, despite the "disengagement" principle.

us is found in the Supreme court's decision in *Sullivan, supra:* "The inquiry ... is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Id.* at 279, 113 S.Ct. 2078. Moreover, "[w]hat the factfinder must determine to return a verdict of guilty is prescribed by the Due Process Clause. The prosecution bears the burden of proving all elements of the offense charged, and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish those elements." *Id.* at 277, 113 S.Ct. 2078. (citations omitted). In cases where self-defense is a defense, and "there is sufficient evidence to justify a self-defense instruction, the burden is on the government to disprove self-defense, by meeting its burden of proof negating the defendant's subjective actual belief or objective reasonableness." *Swann, supra,* 648 A.2d at 930 (citation omitted). As the trial court properly instructed the jury in this case, "[w]here evidence of self-defense is present the government must prove beyond a reasonable doubt that the defendant did not act in self-defense."

Mr. Rorie asserts that the proper standard of harmless error analysis in this case is that found in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see also Mabry v. Demery,* 707 A.2d 49, 51 (D.C.1998) ("Under the test in *Chapman,* constitutional error can be held harmless only if the reviewing court can 'declare a belief that it was harmless beyond a reasonable doubt.'"). By citing *Brooks v. United States,* 599 A.2d 1094 (D.C.1991), the government implicitly argues that the harmless error standard applicable here is not that articulated in *Chapman, supra.* Rather, it is that set forth in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557

(1946). That is, "[t]o conclude that the error in this case was harmless ..., we must be satisfied '*with fair assurance,* after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Brooks, supra,* 599 A.2d at 1102 (quoting *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. 1239) (other citation and footnote omitted).

We conclude that under both of these harmless error standards, the error in giving criminal jury instruction no. 5.16(B) was not harmless because "there was [a] risk that jurors would conclude that they must reject [Mr. Rorie's] self-defense claim," *Stewart, supra,* 687 A.2d at 581, or decide that his fear of imminent harm was unreasonable, because he was the first aggressor, based on (1) his possession of a knife, even though he never used it to threaten Mr. Solice during the episodes leading up to the final one, (2) his confrontations with Ms. Price and his effort to restrain her from going out to purchase more cocaine, and (3) an inference that Mr. Rorie was enraged because, as the trial court implied in deciding to give the aggressor or provocation instruction, and as the government states in its brief: "[J]ust before the fatal conflict [Mr. Solice] made inflammatory remarks attacking [Mr. Rorie's] manhood." and his "simmering rage against [Mr. Solice] exploded," causing him to stab Mr. Solice to death.

To reach the conclusion on the record before us that Mr. Rorie was the aggressor toward Mr. Solice and provoked him, the jury would have to ignore evidence that Mr. Solice was the aggressor, or would have to determine how Mr. Rorie's actions toward Ms. Price and Mr. Solice's verbal barbs and curse words directed toward Mr. Rorie made Mr. Rorie the aggressor or provocateur against Mr. Solice. Furthermore, there is no evidence to sup-

port the government's rebuttal argument that Mr. Solice was "in a peacemaker mode" and that "[f]rom the incident with the hammer on August 23 of 1994 [when Mr. Rorie testified that Mr. Solice attacked him with a hammer] to the three o'clock incident on October 2nd [when Mr. Solice swung a baseball bat at Mr. Rorie three times and smashed the glass table in the living room] right down to the fatal confrontation," Mr. Solice was "there to stop [Mr. Rorie] from having his way with [Ms.] Price" and there was "not a single shred of evidence" that Mr. Solice was "assaulting [Mr.] Rorie" or "doing any damage to [Mr.] Rorie."

As we have indicated, on this record there was no basis on which the trial court reasonably could infer that Mr. Rorie was the aggressor toward or provoked Mr. Solice during the final episode, or that he was the aggressor toward or provoked Mr. Solice because of his behavior toward Ms. Price. Indeed, it was error for the trial court to have given criminal jury instruction No. 5.16(B) because there was no factual predicate for that charge. Even when we "consider the [self-defense] instructions as a whole," *Williams, supra,* 858 A.2d at 995, we are compelled to conclude that the trial court erred. By giving the "defendant as aggressor" or the defendant as the person who "provoked the conflict upon himself" instruction and telling the jurors that if they found that "the defendant was the aggressor or if he provoked the conflict upon himself, he cannot rely upon the right of self-defense to justify his use of force," the trial court not only effectively and improperly took away the government's burden to disprove self-defense, but also "effectively deprived [Mr. Rorie] of his ability to claim self-defense," *State v. Birnel,* 89 Wash.App. 459, 949 P.2d 433, 440 (1998) (citation omitted). In

short, the trial court also erroneously put forth "concepts that, from the accused's point of view, ... [affected the] proper evaluation of the evidence," *Hernandez, supra,* 853 A.2d at 207. In sweeping "the whole context" of October 2, 1994, into consideration of the appropriateness of criminal jury instruction 5.16(B), and ignoring the "disengagement" principle, the trial court lost sight of the proper focus on two considerations—one relating to Mr. Rorie's constitutional right to a defense, that is, a "theory of the case that negates [a defendant's] guilt of the crime charged"; and the other concerning the government's burden of proof—its duty "to disprove self-defense, by meeting its burden of proof negating the defendant's subjective actual belief or objective reasonableness" that "he was in imminent danger of death or serious bodily harm." *Swann, supra,* 648 A.2d at 930 n. 6; *Hernandez, supra,* 853 A.2d at 205.

We conclude that under either the *Chapman* or the *Kotteakos* standard the trial court's error was not harmless. In short, we cannot say that the error was harmless beyond a reasonable doubt, *Chapman, supra,* 386 U.S. at 24, 87 S.Ct. 824; *Birnel, supra,* 949 P.2d at 440 (citations omitted). Nor can we declare, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not swayed by the error." *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. 1239; *Brooks, supra,* 599 A.2d at 1102.

Accordingly, for the foregoing reasons, we reverse the judgment of the trial court and remand this case for a new trial.[10]

*So ordered.*

---

**10.** In his reply brief, Mr. Rorie raises a sufficiency of the evidence argument, contending

that "the evidence was insufficient for the jury to find that the defendant did not act in self-defense or that the defendant exceeded the legal bounds of lawful self-defense." We are satisfied that had the jury been properly instructed, there was sufficient evidence, including reasonable inferences, on which reasonable jurors could conclude beyond a reasonable doubt that Mr. Rorie did not act in self-defense.

Because a new trial is required, we do not address Mr. Rorie's other claims of trial court error or abuse of discretion. Nor do we consider his ineffective assistance of counsel argument. However, we call the trial court's attention to the following cases: *Ford v. United States*, 549 A.2d 1124, 1126 (D.C.1988) ("[G]iven the highly inflammatory nature of an allegation that a witness is a drug user, drug usage other than at the time of the incident testified about is 'generally' not a proper subject ...."); *Williams v. United States*, 642 A.2d 1317, 1320 (D.C.1994) ("[A] party offering extrinsic evidence to impeach a witness' denial of being under the influence of drugs at the time of the incident must first establish a sufficient evidentiary foundation that the witness was in fact under the influence of drugs at the relevant time."); *Bushong v. Park*, 837 A.2d 49, 55 (D.C.2003) (An "expert witness may respond to hypothetical questions that mirror facts already in evidence.").