*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CM-474

SHIRLEY WILLIAMS, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(DVM-2157-11)

(Hon. Brian Holeman, Trial Judge)

(Argued January 22, 2014                    Decided May 15, 2014)

*Raymond J. Rigat* for appellant.

*Trevor N. McFadden*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, *Elizabeth Trosman*, and *John P. Mannarino*, Assistant United States Attorneys were on the brief, for appellee.

Before BECKWITH and EASTERLY, *Associate Judges*, and BELSON, *Senior Judge*.

BELSON, *Senior Judge*: Appellant Shirley Williams was convicted after a bench trial of attempted unlawful possession of a prohibited weapon.[1] She contends on appeal that the evidence was insufficient to establish beyond a

---

[1] D.C. Code §§ 22-1803, 22-4514 (b) (2012 Repl.).

reasonable doubt that she was not acting in self-defense. We agree and reverse her conviction.

## I.

On September 29, 2011, Ms. Williams left her two children in the care of the children's paternal grandparents, Jennifer and Gregory Bragg, while she was at work.[2] When she arrived to pick up the children, an argument arose between Ms. Bragg and Ms. Williams. That argument escalated in an upstairs bedroom. As Ms. Williams prepared the children to leave, the two women became engaged in a physical altercation. According to Ms. Williams, who took the stand in her own defense, Ms. Bragg grabbed her by the arm and told her to "get the F out of her house." As Ms. Williams—who stands only five feet, one or two inches tall and weighs one hundred twenty or thirty pounds—pulled her arm back, she fell and Ms. Bragg—who stands about five feet, nine inches tall and weighs over 200 pounds—fell on top of her. Ms. Williams testified that once she was on the ground, Ms. Bragg started punching and scratching her. Ms. Williams said that the

---

[2] Garrett Bragg, one of Jennifer and Gregory Bragg's sons, is the father of Ms. Williams's children.

only thing she could do to defend herself was to pull on Ms. Bragg's hair, and that when she was able to get up she ran downstairs.

Mr. Bragg testified, on the other hand, that Ms. Williams started the altercation by grabbing his wife "all of a sudden out of nowhere . . . . And the next thing she landed on top of [his] wife and she went at her." In acquitting Ms. Williams of assault for this altercation, the trial court concluded that, given the conflicting testimony, there was no clear evidence of who started the fight. Both Mr. Bragg and Ms. Williams testified that, after Mr. Bragg stepped in and separated the women, Ms. Williams retreated downstairs.

Ms. Williams testified that after she fled down the stairs pursued by Ms. Bragg, she tried to leave by the front door at the foot of the stairs, but could not because it was locked by key. She then turned toward the kitchen, slipping and falling on a rug and trying to avoid objects—a mirror, vases, "glass items, and statue items"—thrown at her by Ms. Bragg. Mr. Bragg acknowledged that once downstairs he was standing between the two women to "keep my wife back, you know, so she don't get hurt . . . . And the next thing I know things are breaking up." He testified that he did not remember "who did what or how it got broken. I just know things was crashing . . . . I mean, I'm turning back to my wife, turning

back to Shirley. It was just so much going on." There was no evidence that Ms. Williams threw any of the objects.[3]

Ms. Williams also testified that she picked up a knife in the kitchen to defend herself and went to the side of the refrigerator to hide behind it. Mr. Bragg saw Ms. Williams with the knife. Both stated that the use Ms. Williams made of the knife was to bang it on a door she was standing next to. Mr. Bragg testified that Ms. Williams was yelling, "You think I'm crazy? I'm going to show you crazy." Ms. Williams testified that after she banged the knife on the door, she "was just holding it." At this point, Adrian Donald, the Braggs' other son, hearing the commotion, came upstairs from his basement room, approached Ms. Williams from the hallway behind her, and placed his hand on hers to take the knife away. He said that the blade of the knife "was facing the direction that she was facing . . . toward the door, which was toward where my mom and my dad [were]." Ms. Williams gave the knife up without a struggle. There was no evidence that Ms.

---

[3] In his findings and related comments, the trial judge stated that Mr. Bragg "was there to observe that there was something going on downstairs so far as glassware, porcelain or pottery are concerned, and that it had to be caused by Ms. Williams was his conclusion based on where everyone else was." There was, however, no testimony by Mr. Bragg to that effect. When asked directly who broke the objects, Mr. Bragg stated, "I don't exactly remember who did what or how it got broken."

Williams advanced toward Mr. and Ms. Bragg with the knife or waived it at them menacingly.

The government did not call the complaining witness, Jennifer Bragg, to testify at trial. The government presented its case solely through the testimony of Gregory Bragg, his son Adrian Donald, and Officer Boockholdt, who responded to the scene that night. Officer Boockholdt's testimony did not, as the trial court observed, offer anything helpful regarding what happened prior to his arrival. The transcript set forth no discussion whether the trial judge should draw an adverse inference against the government from its failure to produce the complaining witness, Ms. Bragg, as it assumedly had the power to produce her for trial and her testimony would have been expected to be favorable to the government.[4] The defense did not ask the court to draw such an inference.

---

[4] *See United States v. Young*, 150 U.S. App. D.C. 98, 103, 463 F.2d 934, 939 (1972) ("It is the rule . . . 'if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it permits an inference that the testimony, if produced, would have been unfavorable.'" (quoting *Graves v. United States*, 150 U.S. 118, 121 (1894))); CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.300 (5th ed. 2013).

Review of Ms. Williams's conviction is made difficult because the trial court did not sort out the testimony into cohesive factual findings. The court found that the truth of what occurred lay "somewhere in between" the testimony of Mr. Bragg and Ms. Williams. After reviewing the testimony, the court said that "on this record either Ms. Williams not only brandished the weapon, but she also destroyed all of [these thrown objects]; or the other side of it is that Ms. Williams was caused to brandish the weapon because . . . these items were being thrown at her." However, the court did not make credibility determinations or make any factual findings on the matter, stating it "cannot determine whether the breakage, if you will, was caused by Ms. Williams or whether it was these were items that were thrown by Ms. Brag[g]."

To resolve the possession charge, the court in effect assumed the facts were as Ms. Williams testified and went on to conclude that Ms. Williams would have had a right to defend herself, but not to the point of picking up a knife and "brandishing" it.

> [I]f those items were thrown by Ms. Brag[g], then it does create a scenario of danger as to Ms. Williams. And if that scenario of danger existed, then Ms. Williams would have the right to defend herself. It's a difficult call to make. In the court's view, picking up a knife, brandishing it in this way, using it or holding it about to

indicate that you would use it in this way, I don't believe
that these circumstances warranted that.

Ms. Williams's efforts, the court reasoned, "could have been better used trying to find some other means to remove herself from that situation." It then concluded that "the government did establish that Ms. Williams had the weapon and on these facts, even if they are to be believed in the way that Ms. Williams testified, the court finds that the conclusion that she was justified in having the knife in this way is not warranted on these facts." The court did not explicitly find that the government had established beyond a reasonable doubt that appellant was not acting in self-defense.

In a subsequent hearing on Ms. Williams's Motion for New Trial/Reconsideration of the Verdict, the court undertook to clarify that its intention in making the trial findings was to state:

on the record that if there had been a true fear for safety
then that effort could have been in trying to get herself
out of the residence as opposed to brandishing the knife
as if she were going to use it against someone. And so in
the court's view there is no demonstration of self-defense
here.

The court added:

> Now there is also a comment that would indicate less than fear, the comment that was attributed to . . . Ms. Williams. While she was holding the knife she said, you want to see crazy? I'm going to show you crazy. It's just, this notion that she was in fear for her safety and therefore used the knife as a means of self-defense was, in the court's view, not supported by the evidence.

## II.

Self-defense can be a defense for a charge of attempted possession of a prohibited weapon "because it can negate the element that the defendant intended to use the weapon unlawfully." *Potter v. United States*, 534 A.2d 943, 946 (D.C. 1987); *see also Stroman v. United States*, 878 A.2d 1241, 1244 (D.C. 2005); CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 6.503 (5th ed. rev. 2013). Where a defendant has presented any evidence that she acted in self-defense, the government bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. *Harris v. United States*, 618 A.2d 140, 148 (D.C. 1992); CRIMINAL JURY INSTRUCTIONS, No. 9.500.

In a situation where the evidence establishes that self-defense would otherwise be justified, that defense nevertheless fails if the evidence also establishes the defendant used greater force than she actually and reasonably believed to be necessary under the circumstances. *Gay v. United States*, 12 A.3d

643, 648 (D.C. 2011). In evaluating whether a person claiming self-defense acted reasonably under the circumstances the fact-finder must take into account that the defendant was acting in the "heat of the conflict." *Brown v. United States*, 256 U.S. 335, 344 (1921). As the model criminal jury instructions state:

> A person acting in the heat of passion caused by an assault does not necessarily lose his/her claim of self-defense by using greater force than would seem necessary to a calm mind. In the heat of passion, a person may actually and reasonably believe something that seems unreasonable to a calm mind.

CRIMINAL JURY INSTRUCTIONS, No. 9.501 (citing *Brown*, *supra*, for the proposition that a self-defense claim is not necessarily defeated because the "defendant, acting in the heat of passion brought on by the assault, used more force than would have appeared reasonable to a calmer mind"). We agree with this articulation. *See Gay*, *supra*, 12 A.3d at 648-49; *Fersner v. United States*, 482 A.2d 387, 391 (D.C. 1984); *Gillis v. United States*, 400 A.2d 311, 313 (D.C. 1979) (citing *Brown*, *supra*). Our cases upholding determinations of excessive force "uniformly involve situations where the secondary, responsive aggression was completely disproportionate to the initial aggression faced." *Gay*, *supra*, 12 A.3d at 649; *see also Gillis*, *supra*, 400 A.2d at 313.

Relevant to our review in this case is this court's observation that "[t]he mere display of a deadly weapon to ward off an attack is not necessarily to be equated to the actual use of deadly force for purposes of evaluating whether the force used was excessive." *Douglas v. United States*, 859 A.2d 641, 642 (D.C. 2004) (citing 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 10.4 (a) (2d ed. 2003)). In *Douglas*, a bench trial, the appellant argued that the trial judge had erred in ruling that he had not produced sufficient evidence to furnish the factual predicate for a legally valid claim of self-defense. *Id.* We reasoned that "[w]hile the judge's factual findings are not as clear as we might wish, it is plain enough that she credited the testimony of the complainant that Douglas was the aggressor" and thus the evidence was sufficient to convict. *Id.* Indeed, the trial court expressly did not credit Douglas's testimony regarding self-defense. *Id.* ("The judge told defense counsel in no uncertain terms that 'the story that your client outlines for me is not credible to me. I don't believe it.'").

*Douglas* is the antithesis of the case before us now. Here, the judge did not make any credibility determinations or factual findings as to whether Ms. Williams was under attack by objects hurled at her by Ms. Bragg moments before she picked up the knife, or whether Ms. Williams knew there was another route of escape other than the locked front door. We cannot thus dispose of the issue in the way

we did in *Douglas* by deferring to a specific factual finding that Ms. Williams was the aggressor.

In a situation where the trial court did not make the findings of fact necessary to support an adjudication our usual course would be to return the case to the trial court to make adequate findings of fact. *See Gay*, *supra*, 12 A.3d at 647. In the matter before us, however, remand for factfinding is not appropriate because the evidence before the court could not have supported a finding that the government had met its burden to establish beyond a reasonable doubt that Ms. Williams did not act in self-defense. *See Peery v. United States*, 849 A.2d 999, 1002 (D.C. 2004) (reversing a conviction because of insufficient evidence and remanding with instructions to enter judgment of acquittal).

A review of the evidence in the record leads to the foregoing conclusion. No testimony was offered that Ms. Williams was throwing any of the objects. Glaringly, Mr. Bragg does not indicate Ms. Williams was throwing any of the objects.[5] Ms. Williams's testimony that Ms. Bragg was throwing objects at her

---

[5] The court expressed concern over Mr. Bragg's testimony, noting that it was "somewhat counterbalanced by his testimony that he loves his wife, he did not want to testify in a way that would get her in trouble." While the court did not believe that he would deliberately deceive the court, "he gave the court the

(continued . . .)

was uncontroverted. Mr. Bragg testified that he was trying to keep his wife back; Ms. Williams also testified that Mr. Bragg was trying to stop his wife's assault by standing in front of her. Also uncontroverted was that Ms. Bragg was around seven inches taller and seventy pounds heavier than Ms. Williams, that the front door was locked, and that Ms. Williams retreated to the kitchen while being pursued by Ms. Bragg.

It is undisputed that Ms. Williams picked up a knife, banged it against a door, and yelled at the Braggs.[6] Adrian Donald testified that the knife was pointed in the direction of the Braggs when he took it from Ms. Williams. However,

---

(. . . continued)
impression that his testimony might be colored because of his relationship to Ms. Bragg."

[6] The trial court and the government rely heavily on Mr. Bragg's testimony that Williams, while holding the knife, yelled, "You think I'm crazy? I'm going to show you crazy." However, as the trial court observed, this statement could have two reasonable interpretations: first, that Williams was "letting others know whom she felt were out to do her harm that she was willing to defend herself, even so far as using the knife"; or, alternatively, that she "was acting in a threatening manner toward Ms. Brag[g]." Ms. Williams's ambiguous statement does not tip the balance of the weight of the evidence to the extent that it dispels any reasonable doubt. *See Peery*, *supra*, 849 A.2d at 1002 (finding the government's evidence insufficient because "both innocent and guilty explanations for [appellant's] behavior may exist, rendering his actions 'insolubly ambiguous'" and "under a standard of beyond a reasonable doubt, 'an innocent person in [appellant's] shoes might have acted exactly as he did'" (quoting *Rivas v. United States*, 783 A.2d 125, 137 (D.C. 2001) (en banc)).

neither Mr. Donald nor Mr. Bragg ever indicated that Ms. Williams waived the knife menacingly at Mr. and Ms. Bragg, or that she made any movement toward them while holding it.

While our review of the sufficiency of the government's evidence is deferential, we "have an obligation to take seriously the requirement that evidence in a criminal prosecution must be strong enough [to be] persuasive beyond a reasonable doubt." *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc). The evidence here was insufficient to permit a reasonable factfinder to say with a "subjective state of near certitude" or without hesitation that Ms. Williams was not acting reasonably under the circumstances confronting her; therefore the evidence was insufficient to carry the government's burden to disprove her claim of self-defense beyond a reasonable doubt. *See Rivas*, *supra*, 783 A.2d at 133 ("The reasonable doubt standard of proof requires the factfinder 'to reach a subjective state of near certitude of the guilt of the accused.'" (quoting *Jackson v. Virginia*, 443 U.S. 307, 315 (1979))); *Smith v. United States*, 709 A.2d 78, 82 (D.C. 1998) (en banc) ("Reasonable doubt is the kind of doubt that would cause a reasonable person, after careful and thoughtful reflection, to hesitate to act in the graver or more important matters in life."); CRIMINAL JURY INSTRUCTIONS, No. 2.108; *see also Douglas*, *supra*, 859 A.2d at 642.

Accordingly, Ms. Williams's conviction for attempted possession of a prohibited weapon is hereby reversed, and the case remanded with instructions to enter a judgment of acquittal.

*So ordered*.