# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 2, 2018        Decided July 24, 2018

No. 13-5275

LEWIS WATERS,
APPELLANT

v.

CHARLES L. LOCKETT, WARDEN,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00049)

*Lisa B. Wright*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A.J. Kramer*, Federal Public Defender.

*Peter S. Smith*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jessie K. Liu*, U.S. Attorney, and *Elizabeth Trosman*, Assistant U.S. Attorney. *Suzanne Grealy Curt*, Assistant U.S. Attorney, entered an appearance.

Before: TATEL, GRIFFITH, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Lewis Waters was convicted of roughly two dozen criminal charges in the District of Columbia arising out of events that occurred in 2005. Waters challenged his convictions in the D.C. Court of Appeals (DCCA), which affirmed his sentence. Failing to find relief in the DCCA, Waters later filed a pro se petition for a writ of habeas corpus in the district court under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254. Waters argued that his appellate counsel before the DCCA provided ineffective assistance by failing to appeal one of Waters's convictions for insufficient evidence. The district court dismissed Waters's petition. We affirm.

I

A

At Waters's trial, the government presented the following evidence: In 2005, Waters worked as an assistant to his cousin Aaron Hargrove, who was enjoying a successful career buying and selling residential real estate. While working for him, Waters learned that many of Hargrove's transactions were in cash and that he kept a large amount of cash on hand. Eventually, their relationship soured and on May 15, 2005, Hargrove fired Waters.

Ten days later, as Hargrove returned home, he noticed Waters and two other men standing outside. Hargrove recognized one man as Devonne Randolph, whom he had met several times before, and noticed Randolph's car parked across the street. Hargrove did not recognize the other man ("John Doe" or "Doe"). Waters approached Hargrove and asked whether he and his friends could use Hargrove's bathrooms. Hargrove assented and the three men entered his house.

Randolph went upstairs to use the bathroom on the second floor. Doe went to another bathroom in the basement. Because Doe was a stranger, Hargrove followed him. While Doe and Hargrove were downstairs, Waters came down and knocked on the bathroom door. Doe exited with a gun drawn and pointed it at Hargrove's face. Waters announced that the men were robbing Hargrove and commanded him to get on the ground. Hargrove complied and Waters told Doe to watch Hargrove carefully. Waters also directed Doe to kill Hargrove if he caused any trouble.

As Hargrove was lying on the ground, Waters asked him where he kept his cash. Hargrove said the money was in his car and that Waters could take whatever he wanted. Waters went upstairs while Doe kept watch over Hargrove in the basement. Approximately ten minutes later, Waters returned and repeatedly suggested that the men should "just kill" Hargrove. Believing that he was going to die but preferring to die "on [his] feet like a man," Hargrove charged Doe to get the gun. Doe passed the gun to Waters who shot at Hargrove until he emptied the chamber, striking Hargrove once in his hand, once in his arm, twice in his face, and once in the back of his head.

Injured but enraged, Hargrove chased Waters into a utility room next to the basement, grabbed him, and threw him to the ground. The two men wrestled until Hargrove began to beat Waters's head against a gas line in the hopes of blowing up the house and killing his three assailants along with himself. As Waters and Hargrove fought, Waters yelled for Randolph and Doe to stab him. They did, approximately twenty-seven times. Doe also repeatedly struck Hargrove with a blunt object. Miraculously, Hargrove did not die, but played possum until his attackers left. Then he struggled to the house next door, and his neighbor called the police.

When the police arrived, Hargrove was lying on the ground in front of his neighbor's house covered in blood. As paramedics worked to save him, Hargrove explained that Waters had shot him. Local television stations began to broadcast news of the Hargrove attack later that day.

When police searched Hargrove's car, they found the center console open. And after searching Hargrove's house, the police also found an empty money wrapper on Hargrove's night stand indicating that it once held $2,000. Police later seized Randolph's car and recovered a letter written by Randolph describing his recent need to "make a couple of money moves" including one that had recently "pop[p]ed up on [the] news."

B

Waters and Randolph were both indicted in March 2006 on twenty-six criminal charges, mostly dealing with various forms of assault, kidnapping, burglary, armed robbery, theft, and the unlawful possession of firearms. Following a ten-day jury trial, Waters and Randolph were convicted of most counts and Waters was sentenced to prison terms totaling eighty-one years. Waters now challenges only two of those assault-related convictions—assault with intent to kill using a knife (the "intentional knife charge") and aggravated assault with a knife (the "aggravated knife charge"). For his conviction on the intentional knife charge, Waters was sentenced to seventeen years in prison. And for his conviction on the aggravated knife charge, Waters received a twelve-year sentence.

Waters and Randolph appealed several of their convictions to the DCCA, which vacated some because they had "merged" with others, but otherwise affirmed the defendants' convictions and their sentences, including those resulting from the

intentional knife and aggravated knife charges. Waters and Randolph petitioned the DCCA for rehearing and rehearing en banc and Waters petitioned the U.S. Supreme Court for a writ of certiorari, all of which were denied.

Following the DCCA's denial of the rehearing petitions, Waters moved pro se to recall the DCCA's mandate. In his motion, Waters argued, among other things, that his appellate counsel had been ineffective for failing "to appeal Waters' conviction of Ass[a]ult with intent to kill while armed with a knife on the grounds of insufficient evidence." The DCCA denied this motion without explanation.

Waters then filed a pro se petition for a writ of habeas corpus in district court pursuant to 28 U.S.C. § 2254. Among other issues, Waters again challenged his conviction on the ground he received ineffective counsel because his "appellate counsel refused to appeal [his] conviction for ass[a]ult with intent to kill on the grounds of insufficient evidence."

The district court denied Waters's petition and his ensuing motion for reconsideration. The district court reasoned that even if Waters's appellate counsel mistakenly failed to challenge the sufficiency of the evidence supporting conviction on the intentional knife charge, Waters had provided no basis for finding that the outcome of his appeal would have been any different. *See Waters v. Lockett*, 956 F. Supp. 2d 109, 114-15 (D.D.C. 2013).

Waters timely filed his notice of appeal in our court.

We held Waters's appeal in abeyance until the district court decided whether to grant Waters a certificate of appealability (COA). The district court ultimately denied the COA, and the government moved to dismiss Waters's appeal

because of that. We appointed Waters counsel and granted him a COA "with regard to the issue whether [Waters] was deprived of his right to effective assistance of appellate counsel by his appellate counsel's failure to challenge his conviction of assault with intent to kill with a knife by arguing that he withdrew from the conflict and was acting in self-defense." Order, *Waters v. Lockett*, No. 13-5275 (D.C. Cir. Sept. 16, 2014).

In his opening brief, Waters also asserts that his habeas petition's challenge to the intentional knife charge "applies equally" to the aggravated knife charge. Waters Br. 2 n.1. And in a pro se supplemental brief Waters claims that the district court violated his Fifth Amendment right to a grand jury indictment when it denied his habeas petition. Specifically, Waters argues that the district court added a "new crime" to Waters's conviction when it stated that Waters and his co-conspirators "robbed" Hargrove of cash, even though Waters was never indicted for robbing Hargrove. Suppl. Br. 1; *see also Waters*, 956 F. Supp. 2d at 111.

II

The district court had jurisdiction over Waters's habeas petition pursuant to 28 U.S.C. § 2254(a). Because we issued a COA on Waters's ineffective-assistance-of-appellate-counsel claim, we have jurisdiction over Waters's appeal on that claim pursuant to 28 U.S.C. §§ 1291, 2253(a), (c)(1)(A).

When reviewing a district court's denial of a writ of habeas corpus, we review questions of law de novo and factual findings for clear error. *Payne v. Stansberry*, 760 F.3d 10, 13 (D.C. Cir. 2014).

III

AEDPA provides our standard for reviewing Waters's underlying habeas petition. AEDPA sets forth a highly deferential standard of review if a petitioner directs his collateral challenge at a state-court judgment. *See* 28 U.S.C. § 2254(d). Waters filed his petition in the district court to challenge the DCCA's rejection of his ineffective-assistance claim when the DCCA denied his motion to recall the mandate. We therefore treat Waters's petition as a collateral challenge to a state-court judgment because AEDPA "recognizes that 'a court of the District [of Columbia] is a state court.'" *Head v. Wilson*, 792 F.3d 102, 106 n.3 (D.C. Cir. 2015) (quoting *Madley v. U.S. Parole Comm'n*, 278 F.3d 1306, 1308 (D.C. Cir. 2002)).

As such, for any matter "adjudicated on the merits in [D.C.] court,"[*] Waters must show that the DCCA's decision

---

[*] AEDPA's deferential standard applies only when a claim is "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). When a state court does *not* reach the merits of a claim, we review de novo. *See Cone v. Bell*, 556 U.S. 449, 472 (2009). Although the DCCA's summary order denying Waters's motion to recall the mandate is silent as to whether the court actually adjudicated the merits of Waters's ineffective-assistance claim, we presume it did "in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). We see no indication why this presumption would not apply here. Waters raised his claim in his motion to recall the mandate, filed directly with the DCCA. The DCCA has previously held that a motion to recall the mandate is "the appropriate vehicle for mounting a challenge to the effectiveness of appellate counsel." *Williams v. Martinez*, 586 F.3d 995, 999 (D.C. Cir. 2009) (citing *Streater v. Jackson*, 691 F.2d 1026, 1028 (D.C. Cir. 1982), and *Watson v. United States*, 536 A.2d 1056, 1060-61

"was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the . . . proceeding." 28 U.S.C. § 2254(d)(1), (2). And because the DCCA rejected Waters's ineffective-assistance claim "unaccompanied by an explanation," Waters's burden under AEDPA "must be met by showing there was no reasonable basis for the [D.C.] court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

A state-court decision has a reasonable basis so long as "fairminded jurists could disagree" over its correctness. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). And "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102. If this standard seems difficult to meet, "that is because it was meant to be." *Id.*

With respect to ineffective-assistance claims, our touchstone is the Court's two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance under *Strickland*, a defendant must demonstrate that (1) his counsel's performance "fell below an objective standard of reasonableness" and (2) that counsel's ineffectiveness was

---

(D.C. 1987)). As the DCCA has explained, it will recall the mandate and reopen an appeal for ineffective-assistance-of-appellate-counsel claims if "they have on their face sufficient merit" and "set forth in detail a persuasive case." *Watson*, 536 A.2d at 1060. Therefore, no "state-law procedural principles" prevented the DCCA from addressing the merits of Waters's ineffective-assistance claim when he moved to recall the mandate. *Richter*, 562 U.S. at 99. Because we presume the DCCA decided Waters's ineffective-assistance claim on the merits, AEDPA's deferential standard applies.

prejudicial, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Payne*, 760 F.3d at 13 (quoting *Strickland*, 466 U.S. at 687-88, 694). Moreover, there is a "strong presumption" that counsel's performance fell within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

To be clear, however, our review of an ineffective-assistance claim under AEDPA is not the same as it would be on direct appeal. In that latter case, we would simply decide whether the counsel's performance was ineffective under *Strickland* itself. Meanwhile, under AEDPA a petitioner must prove that the state court's application of the *Strickland* standard was *unreasonable*, not simply that he should prevail under *Strickland*. *See Richter*, 562 U.S. at 101; *see also Williams v. Taylor*, 529 U.S. 362, 410 (2000) ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Therefore, a "state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Richter*, 562 U.S. at 101; *see also Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (describing review of state-court ineffective-assistance determinations under § 2254 as "doubly deferential"). Even though "[s]urmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult," *Richter*, 562 U.S. at 105.

To summarize, Waters's AEDPA claim requires him to show that no fairminded jurist could defend the DCCA's rejection of his ineffective-assistance claim under *Strickland*. And as part of his claim, Waters must overcome *Strickland*'s

"strong presumption" that counsel acts within the bounds of reasonable assistance. This is a tall order.

If this "doubly deferential" standard were not challenging enough, Waters's *Strickland* claim rests on a legal argument that is also stacked heavily against him. Waters contends that his appellate counsel before the DCCA failed to raise a challenge to the sufficiency of the evidence presented in support of his conviction for the intentional knife charge. To have succeeded on that challenge, Waters would have had to prove that, after reviewing the evidence in the light most favorable to the government, *no* rational trier of fact could have found beyond a reasonable doubt the essential elements supporting Waters's conviction. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because this standard "seeks to preserve the jury's role as fact-finder," a defendant "faces a high threshold and bears a heavy burden when seeking to overturn a guilty verdict on this ground." *United States v. Borda*, 848 F.3d 1044, 1053-54 (D.C. Cir.) (internal quotation marks omitted), *cert. denied*, 137 S. Ct. 2315 (2017).

All told, for Waters to succeed on his habeas petition he must overcome *three* overlapping burdens against him: one under AEDPA, one under *Strickland*, and one under the standard for all sufficiency challenges. Keeping in mind this trio of thumbs on the scale against Waters, we now turn to the merits of his ineffective-assistance claim.

IV

A

Under the first prong of *Strickland*, we ask here whether Waters's appellate counsel performed deficiently. Given our standard of review under AEDPA, we must deny Waters's

petition if fairminded jurists could disagree about whether Waters failed to overcome the "strong presumption" that his appellate counsel's conduct met the "objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 689.

1

The objective standard of reasonableness for appellate counsel does not require counsel to pursue every possible argument on behalf of a criminal defendant. Indeed, appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). When a defendant argues appellate counsel failed to raise a particular claim, "it is difficult to demonstrate that counsel was incompetent," *id.*, because generally "only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome," *id.* (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)); *see also Burger v. Kemp*, 483 U.S. 776, 784 (1987) (finding no ineffective assistance of counsel when the decision to raise a particular issue had "a sound strategic basis").

Building off these principles, we have held that "counsel does not perform deficiently by declining to pursue a losing argument." *United States v. Watson*, 717 F.3d 196, 198 (D.C. Cir. 2013); *see also United States v. Kelly*, 552 F.3d 824, 831 (D.C. Cir. 2009) (explaining that an ineffective-assistance claim "plainly fails inasmuch as [the defendant's] counsel was not obliged to raise a meritless defense").

In sum, so long as fairminded jurists could disagree about the prospects of Waters's sufficiency claim succeeding, they could disagree about whether his appellate counsel met the

objective standard of reasonableness under *Strickland*. And if fairminded jurists could disagree over that latter point, then under AEDPA we must deny Waters's habeas petition. We therefore turn to the merits of Waters's sufficiency claim.

2

In his sufficiency claim, Waters argues that no rational juror—viewing the evidence in the light most favorable to the government—could have found him guilty beyond a reasonable doubt on the intentional knife charge because he acted in self-defense. This argument fails. To show why, a brief primer on D.C. self-defense law is in order.

To justify self-defense in the D.C. courts, the record must reflect that: "(1) there was an actual or apparent threat to the defendant; (2) the threat was unlawful and immediate; (3) the defendant honestly and reasonably believed that he was in imminent danger of death or serious bodily harm; and (4) the defendant's response was necessary to save himself from danger." *Murphey-Bey v. United States*, 982 A.2d 682, 690 (D.C. 2009). However, a defendant cannot claim self-defense if he "was the aggressor or if [h]e provoked the conflict upon himself[]." *Id.* (quoting *Rorie v. United States*, 882 A.2d 763, 772 (D.C. 2005)). That said, an aggressor can restore his right to self-defense "[o]nly in the event he communicates to his adversary his intent to withdraw and in good faith attempts to do so." *Id.* at 690-91 (quoting *Rorie*, 882 A.2d at 772).

Even when the evidence establishes that self-defense would otherwise be justified, "that defense nevertheless fails if the evidence also establishes the defendant used greater force than [h]e actually and reasonably believed to be necessary under the circumstances." *Williams v. United States*, 90 A.3d 1124, 1128 (D.C. 2014). In evaluating whether the person

claiming self-defense acted reasonably under the circumstances, the fact-finder must take into account that the defendant acted in the "heat of the conflict." *Id.* (quoting *Brown v. United States*, 256 U.S. 335, 344 (1921)). Even so, the fact-finder should recognize excessive force when the "secondary, responsive aggression was completely disproportionate to the initial aggression faced." *Id.* (quoting *Gay v. United States*, 12 A.3d 643, 649 (D.C. 2011)).

Once a defendant presents *any* evidence that he acted in self-defense, the government assumes the burden of proving beyond a reasonable doubt that he did not. *Parker v. United States*, 155 A.3d 835, 842 (D.C. 2017). In his testimony, Waters presented some evidence indicating that he acted in defense when asking Randolph and Doe to stab Hargrove. Therefore, the government bore the burden of proving beyond a reasonable doubt that Waters did not act in self-defense.

Waters argues that "*any* rational trier of fact" would conclude that the government failed to demonstrate beyond a reasonable doubt that Waters did not act in self-defense. *United States v. Boyd*, 803 F.3d 690, 692 (D.C. Cir. 2015) (quoting *Jackson*, 443 U.S. at 319). Instead, according to Waters, the evidence presented at trial demonstrated that he communicated to Hargrove his intention that he sought to withdraw from the conflict in good faith, thereby restoring his right to self-defense. Further, Waters claims that he reasonably believed he was in danger of death or serious bodily harm, justifying his asking Randolph and Doe to stab Hargrove. Finally, Waters argues that the degree of force used—having Randolph and Doe stab Hargrove twenty-seven times—was necessary under the circumstances to avoid serious bodily harm.

We disagree. Put simply, a rational juror could reject Waters's self-defense claim when viewing the evidence in a

light most favorable to the government. We can imagine at least two ways in which a rational juror could have concluded that Waters did not act in self-defense when instructing his co-conspirators to stab Hargrove.

First, a rational juror could have concluded that Waters did not "withdraw" from the conflict because insufficient time had elapsed between his retreat and when the fight reinitiated. Generally, an effective withdrawal happens after a period of "disengagement" between parties. An initial aggressor does not have a restored right to self-defense when the latter confrontation reflects only a "stage[] in an essentially continuous chain of events." *United States v. Grover*, 485 F.2d 1039, 1043 (D.C. Cir. 1973). Hargrove testified that the time between the gunshots and the moment that Randolph and Doe began stabbing him "may have been thirty seconds." 9/12/06 Tr. 148. A rational juror could readily conclude that the fight's movement from the basement to the utility room took place in such a short period that the encounters were "stages in an essentially continuous chain of events" rather than two distinct conflicts separated by Waters's withdrawal.

Second, even if Waters withdrew from the conflict, and restored his self-defense right, his defense would still fail if he and his co-conspirators used excessive force to repel Hargrove's attack. *See Parker*, 155 A.3d at 845-46; *Williams*, 90 A.3d at 1128; *Gay*, 12 A.3d at 649. A rational juror could conclude that Waters directed his co-conspirators to use excessive force. When Hargrove attacked Waters by banging his head against a gas line, Waters allegedly called out to Randolph and Doe, "This [guy] is trying to kill me. Ya'll stab him. Stab him. Do something. Don't just stand there. Stab him." 9/12/06 Tr. 148. Note that Waters specifically demanded his co-conspirators "stab" Hargrove, rather than merely "stop" him. Despite the fact that three men should have been able to

subdue Hargrove—who was suffering from multiple gunshot wounds and bleeding profusely—Waters insisted that they stab him anyway. While the D.C. courts counsel jurors to consider a defendant's thought process in the "heat of the conflict," *Williams*, 90 A.3d at 1128, the heat of the moment might not have justified Waters singling out the need to "stab" Hargrove unless Waters wanted more than merely his own self-defense— unless he wanted Hargrove dead. And the result of Waters's command—Randolph and Doe stabbing Hargrove *twenty-seven times*—was arguably "completely disproportionate" to countering Hargrove's attack. *Gay*, 12 A.3d at 649. At the very least, a rational juror could conclude beyond a reasonable doubt that even if Waters could claim a right to self-defense, he and his co-conspirators used an unreasonable amount of force to stop the injured Hargrove's counterattack.

The DCCA reasonably concluded that a rational juror could find that Waters did not act in self-defense. As such, the DCCA also reasonably concluded that Waters's appellate counsel did not act deficiently under *Strickland* by forgoing a losing argument.

B

While we need not address *Strickland*'s second prong, which requires Waters to show prejudice from his counsel's conduct, we note that when it comes to ineffective-assistance claims leveled against *appellate* counsel, there is not much daylight between *Strickland*'s deficiency prong and its prejudice prong. *See, e.g.*, *Howard v. Gramley*, 225 F.3d 784, 790-91 (7th Cir. 2000); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989). If appellate counsel reasonably opts not to raise an issue with little or no likelihood of success, then there is usually no "reasonable probability" that raising the issue would have changed the result of a defendant's appeal. *Strickland*,

466 U.S. at 694. Such is the case here. Because of the weakness of his sufficiency claim, a fairminded jurist could also conclude Waters was not prejudiced under *Strickland*.

We therefore accept the DCCA's reasonable application of *Strickland* and affirm the district court's dismissal of Waters's habeas petition.

V

A

In his pro se pleadings Waters only challenged the sufficiency of the evidence presented for his intentional knife charge. He made no mention of his aggravated knife charge. And the COA is likewise limited to whether Waters was "deprived of his right to effective assistance of appellate counsel by his appellate counsel's failure to challenge his conviction of *assault with intent to kill with a knife* . . . ." Order, *Waters v. Lockett*, No. 13-5275 (D.C. Cir. Sept. 16, 2014). But in his opening brief Waters now seeks to fold a challenge to his aggravated knife charge into his sufficiency claim on the intentional knife charge. Waters Br. 2 n.1.

The question of whether, and when, to allow an expansion of a COA is unsettled in our circuit. Many of our sister circuits have local rules addressing the expansion of COAs, and many of those circuits' cases draw on their local rules. Our circuit has no local rule governing this issue.

When a habeas petitioner files his initial brief, some circuits allow the petitioner to raise issues that were not previously certified for review. However, those courts *also* generally require petitioners to "notify th[e] court of the[ir] desire to expand the COA" by filing a "separate statement."

*Reid v. True*, 349 F.3d 788, 796 (4th Cir. 2003); *see also Dung The Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per curiam) (explaining that circuit rules allowed a habeas petitioner "to expand the COA by presenting uncertified issues, *under a separate heading*, in his opening brief" (emphasis added)); *Jones v. United States*, 224 F.3d 1251, 1255-56 (11th Cir. 2000) (discussing the "explicit request" requirement for expanding a COA).

Based on these precedents, it's unclear whether Waters adequately requested in his opening brief that we expand the COA. Waters simply asserted in a footnote that the "issue he raised" related to the intentional knife charge "applies equally" to the aggravated knife charge. Waters Br. 2 n.1. Waters argues in his reply brief that this passing reference to the aggravated knife charge amounted to an expansion request. *See* Reply Br. 3-4.

Even if we assume that Waters requested such an expansion in his opening brief, we may not grant his request. When making a COA determination, we "look to the *District Court's application* of AEDPA to petitioner's constitutional claims and ask whether *that resolution* was debatable amongst jurists of reason." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (emphases added); *see also id.* at 338 ("The petitioner must demonstrate that reasonable jurists would find *the district court's assessment* of the constitutional claims debatable or wrong." (emphasis added)); *id.* at 348 ("The COA inquiry asks only if *the District Court's decision* was debatable." (emphasis added)). Because our COA determination turns on the district court's resolution of Waters's claims, it follows that we may only grant a COA when the district court had the opportunity below to consider the claim for which Waters requests a COA.

In light of this requirement, ordinarily, to present new claims on the merits, a habeas petitioner "would have to amend his habeas petition to add his new claims" or "file a second or successive habeas application." *Milton v. Miller*, 812 F.3d 1252, 1265 (10th Cir.), *cert. denied*, 137 S. Ct. 69 (2016). Waters did neither with respect to his appellate counsel's handling of the aggravated knife charge. Waters's habeas petition made no mention of the aggravated knife charge. Nor did his motion in the DCCA to recall the mandate. As such, the district court never had an opportunity to consider that claim and we may not grant a COA on any claim that the district court could not consider. Therefore, even assuming that Waters validly requested an expanded COA regarding the aggravated knife charge, we must deny that request.

B

Additionally, Waters filed a pro se supplemental brief, sent via email to the Federal Public Defender's Office. In that brief, Waters argues that the district court violated his Fifth Amendment right to a grand jury indictment by suggesting that Waters had "robbed" Hargrove, even though Waters was never indicted for robbing Hargrove. *See* Suppl. Br. 1-2. This issue also falls outside the scope of the COA. In a pro se supplemental reply brief, Waters asserts that the Fifth Amendment issue "cannot be separated from this Court's consideration of the COA sanctioned issue." Suppl. Reply Br. 1.

We conclude that Waters failed to request an expansion of the COA in his opening pro se supplemental brief. Waters first mentioned the scope of the COA in his pro se supplemental reply brief. And because Waters raised the issue of expanding the COA for the first time in his pro se supplemental reply brief,

that argument is forfeited. *See United States v. Gurr*, 471 F.3d 144, 152 n.3 (D.C. Cir. 2006).

In any event, even if we assume that Waters's opening pro se supplemental brief adequately requested that we expand the COA, we lack jurisdiction to consider Waters's Fifth Amendment claim. When we initially denied a COA on this claim we cited D.C. Code § 23-110. Pursuant to § 23-110, a prisoner convicted in D.C. Superior Court may raise a collateral constitutional challenge to his sentence by motion in that court, but may not apply for a writ of habeas corpus "unless it . . . appears that the remedy by [§ 23-110] motion is inadequate or ineffective to test the legality of his detention." *Id.* § 23-110(g); *Ibrahim v. United States*, 661 F.3d 1141, 1142 (D.C. Cir. 2011).

Moreover, "resolution of an issue on direct review bars relitigation of that issue in a [D.C.] court" under § 23-110. *Garris v. Lindsay*, 794 F.2d 722, 727 (D.C. Cir. 1986). Even though Waters characterizes his challenge as one aimed at the district court, his true target is the DCCA, which squarely addressed and rejected Waters's Fifth Amendment claim on direct review. *See Randolph v. United States*, No. 07-CF-539, slip op. at 10 n.7 (D.C. Jan. 5, 2011). Waters all but concedes as much. *See* Suppl. Br. 1 ("The District Court's confusion appears to come from it's [sic] endorsement of the DCCA's Memorandum opinion . . . ."). Habeas corpus is available to Waters only if the remedy available under § 23-110 is "*inadequate or ineffective* to test the legality of his detention." *Garris*, 794 F.2d at 727 (emphasis added) (quoting D.C. Code § 23-110(g)). Simply because Waters chose to raise his Fifth Amendment claim on direct appeal, and was therefore barred from pursuing a § 23-110 motion on the issue, that did not render any potential § 23-110 remedy "inadequate or ineffective," nor open the door to federal habeas relief. *See id.*

("It is the inefficacy of the remedy, not a personal inability to utilize it, that is determinative . . . .").

Because § 23-110 offered Waters a sufficient remedy in the D.C. courts on his Fifth Amendment claim, he may not seek federal habeas relief. We therefore lack jurisdiction to hear this claim and consequently decline to expand the COA.

## VI

We affirm the district court's judgment.

*So ordered.*